**FEDERAL TRADE COMMISSION,**
Appellant,

v.

**NATIONAL TEA COMPANY, National (Holding) Company, National Supermarkets, Inc., and Applebaums' Food Markets, Inc., Appellees.**

No. 79–1503.

United States Court of Appeals,
Eighth Circuit.

Submitted June 29, 1979.

Decided July 16, 1979.

Geisler, Jr., Shearman & Sterling, New York City, and Robert F. Henson, Henson & Efron, Minneapolis, Minn., for National Tea Company.

Victor S. Friedman, Fried, Frank, Harris, Shriver & Jacobson, New York City, and Milton H. Altman, Altman, Weiss & Bearmon, St. Paul, Minn., for Applebaums' Food Markets, Inc.

Before HEANEY, BRIGHT and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

The Federal Trade Commission asks this Court to reverse a judgment of the United States District Court for the District of Minnesota. That court refused the FTC's request to temporarily enjoin National Tea Company, a large retail grocery chain, operating stores in the Minneapolis-St. Paul metropolitan area, from acquiring Applebaum's Food Markets, Inc., another retail grocery chain operating in the same area. We refuse to reverse because we are convinced that the District Court's decision to deny the preliminary injunction was not based on an erroneous view of the law and was not an abuse of discretion.

## I. PROCEDURAL BACKGROUND

Applebaums operates a chain of twenty-six retail grocery stores in the five-county Minneapolis-St. Paul metropolitan area. National[1] operates nineteen similar stores in the same area. On February 2, 1979, National and Applebaums entered into a merger agreement by which National would acquire Applebaums.

The FTC issued a complaint on April 17, 1979, charging that this acquisition would substantially lessen competition or tend to create a monopoly in the Minneapolis-St. Paul area in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

Edward F. Glynn, Jr. and W. Dennis Cross, Gen. Counsel, Federal Trade Commission, Joseph Tasker, Jr., Atty., Bureau of Competition, Federal Trade Commission, Washington, D. C., and Stephen G. Palmer, Asst. U.S. Atty., Minneapolis, Minn., for Federal Trade Commission.

Francisca A. Sabadie, James T. Halverson, Gregory S. Bentley and Thomas M.

---

1. National operates two hundred and thirteen food stores organized into four divisions located in various segments of the United States.

The Minneapolis Division operates forty-three stores in Minnesota, North Dakota, Wisconsin and Michigan.

On April 19, 1979, the FTC, pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), sought a preliminary injunction in the District Court for the District of Minnesota to restrain the merger during the pendency of the administrative proceedings. The District Court referred the matter to a magistrate who conducted a six-day evidentiary hearing. On June 15, 1979, the magistrate filed his findings of fact and conclusions of law. He concluded that a likely effect of the merger may be to substantially lessen competition and recommended that a preliminary injunction issue. On June 21 and 22, 1979, the District Court considered the magistrate's findings and recommendations, the respondent's objections thereto, and heard additional oral arguments. Three days later, on June 25, 1979, the District Court denied the FTC's motion for a preliminary injunction. Thereafter, the FTC petitioned the District Court for an injunction pending appeal. This, too, the District Court denied.

On June 26, 1979, the FTC petitioned this Court for an injunction pending appeal which Stephenson, J., then issued for a three-day period. On June 29, 1979, after oral argument, this panel continued that injunction until we could review the record and briefs and reflect on the oral arguments. We have decided to forego the question of whether an injunction pending appeal should issue and to reach the question as to whether the District Court erred in denying the preliminary injunction. We do so because the record is extensive, the briefs are thorough, the oral argument was comprehensive and no useful purpose would be served by delaying a resolution of this issue until this Court meets in September.[2] We, of course, do not determine in this proceeding the ultimate question of whether the acquisition is violative of either the Clayton or Federal Trade Commission Acts. These questions are to be decided in the first instance by the FTC.

2. In briefs and at oral argument, the FTC stated that it was willing to submit the matter for final administrative decision on the basis of the

## II. STANDARD OF REVIEW

■ The standard of review is a relatively simple one. The denial of a preliminary injunction may be reversed only if the trial court abused its discretion or based its decision on an erroneous legal premise. *See Modern Controls, Inc. v. Andreadakis,* 578 F.2d 1264, 1270 (8th Cir. 1978); *Waste Management, Inc. v. Deffenbaugh,* 534 F.2d 126, 129 (8th Cir. 1976). *Accord, F.T.C. v. Simeon Management Corp.,* 532 F.2d 708, 711 (9th Cir. 1976). In our view, the District Court did neither.

### A. The Legal Standard

We first consider whether the District Court applied the proper legal standard. Section 13(b) of the Federal Trade Commission Act, under which the Commission seeks relief, sets out that standard:

Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted[.]

15 U.S.C. § 53(b).

### 1. The Equities

The magistrate held that public and private equities were to be considered. He found that the principal public equity was that an after-the-fact remedy of divestiture would be inadequate because the merged entity would "truly be a whole whose original parts will, practically speaking, not be capable of distinction." He recognized that there were private equities as far as Applebaums was concerned. He found that:

Applebaums' faces serious problems in terms of continuity of its top-level management. Of its five top executives, three have serious health problems. Singer [the Chairman of the Board] himself joined the company in 1934. To obtain outside professional management would require payment of salaries at

record made before the magistrate because it considered the record a complete one.

least double those presently drawn by Applebaums' management. Further, the board of Applebaums' is reluctant to turn over to outside management a company in which various members of the family have invested most of their lives.

Except for one offer made by Lucky Stores in 1976 and National's offer, Applebaums' management has not had any opportunity to merge or sell the company. National's offer is $15.25 per share, while Applebaums' stock was trading, prior to the offer, at $6 per share.

He concluded, however, that the equities failed to compare as neither Applebaums nor National would fold if the merger fell through, and that the worst that could happen to either was financial losses resulting from past business judgments.

The District Court agreed that public and private equities were to be considered but rejected the magistrate's finding that the public equities predominated. He found the equities to be "close." He reasoned that divestiture would probably not be a severe problem as National has agreed that "if, after final judgment, divestiture is ordered in this matter, National Tea will divest Applebaums' as 'Applebaums', within six months after such final judgment is entered," to a FTC-approved purchaser, and National stipulated that, if divestiture is ordered after final judgment, it will not assert difficulty of divestiture as a defense.[3]

In our view, the District Court properly considered public and private equities. *See F.T.C. v. Simeon Management Corp., supra,* at 717. Moreover, there is nothing in its opinion that would indicate that it did not agree that public equities are to be given the greater weight. *See id.*[4] It simply didn't agree with the magistrate's findings, particularly the finding that divestiture would cause serious problems. We cannot say that its findings were clearly erroneous or its decision an abuse of discretion. National has agreed to divest itself of Applebaums within six months of a final judgment and the FTC has indicated that the matter can be fully decided by the Commission within eight months from the date of this opinion. Not many fundamental changes can be made in the operation of the merged stores during this short period. Moreover, it will be to National's self interest to cooperate in achieving an early disposition because, if the merger is ultimately disapproved, the full burden of divestiture falls on it. The longer the delay in achieving a final disposition in the matter, the greater will be the difficulty and the cost National may incur.[5]

### 2. Likelihood of Ultimate Success

Having held that the trial court's finding that the equities were close and did not tip the scale in either direction was not an abuse of discretion, we turn to review the

---

**3.** At oral argument, National committed itself unequivocally to divest itself of Applebaums within six months of a final judgment. This unequivocal commitment eliminates the possibility that National will assert price or difficulty as a reason to delay or frustrate divestiture.

**4.** In *F.T.C. v. Food Towns Stores, Inc.,* 539 F.2d 1339 (4th Cir. 1976), Judge Winter, sitting alone, concluded that *only* the public equities are to be weighed in consideration of applications for 13(b) preliminary injunctions. *Id.* at 1346. We believe that this goes too far. Certainly, in light of the statute's purpose to protect the public-at-large, rather than individual private competitors, courts must properly emphasize the public equities. However, we do not think that it was the intention of the statute's drafters to totally shield from judicial view the private equities which may merit inclusion in the courts' equitable overview.

**5.** By our holding today, we in no way intend to minimize the fact that, historically, divestiture has been a problematic and often ineffective remedy. As noted by the Court in *F.T.C. v. Dean Foods Co.,* 384 U.S. 597, 607 n.5, 86 S.Ct. 1738, 1744, n.5, 16 L.Ed.2d 802 (1966):

> Administrative experience shows that the Commission's inability to unscramble merged assets frequently prevents entry of an effective order of divestiture.

Here, however, National has unequivocally stipulated to effect a divestiture, if so ordered, within six months of the time of the order. Consequently, the burdens of "unscrambling the merged assets" shifts from the government to National. This, we take it, will motivate National to make every effort to aid the government in achieving a speedy final resolution of the matter.

District Court's decision regarding the FTC's showing of likelihood of ultimate success.

The magistrate and the District Court did not entirely agree on the standard to be used in determining the likelihood of ultimate success. The magistrate concluded that the FTC must raise

> questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.

*Federal Trade Com'n v. Beatrice Foods Co.,* 190 U.S.App.D.C. 328, 332, 587 F.2d 1225, 1229 (1978) (statement of Circuit Judges MacKinnon and Robb). *Accord, F.T.C. v. Rhinechem Corp.,* 459 F.Supp. 785 (N.D.Ill. 1978); *F.T.C. v. Lancaster Colony Corp., Inc.,* 434 F.Supp. 1088, 1091 (S.D.N.Y.1977). The District Court indicated that it felt that a standard somewhat higher than that articulated by the magistrate ought to be used. It failed, however, to delineate what that higher standard was, stating that even if the magistrate's standard was applied, the FTC had failed to make a showing sufficient to entitle it to injunctive relief.

■ We believe that the standard articulated by the magistrate is the proper one. Because the District Court considered that standard, no error of law is presented. The Commission has argued that the proper standard is whether the Commission has shown that it has a "fair or tenable chance of ultimate success on the merits." We note that this formulation was originally presented in the same opinion as the standard adopted by the magistrate and, apparently, other courts have thought the two to be interchangeable. *See Federal Trade Com'n v. Beatrice Foods Co., supra,* and *F.T.C. v. Lancaster Colony Corp., Inc., su-*

*pra.* We don't believe that they are. We think that the issuance of preliminary injunctions under a standard requiring only that the FTC show a fair and tenable chance of success reduces the judicial function to a rubber stamp procedure. This, we think, stands in clear violation of the congressional intent that the courts exercise their independent judgment in reviewing the FTC's preliminary injunction applications.[6]

On the other hand, National has urged a more stringent standard requiring that the FTC show a "strong likelihood" of its ultimate success on the merits. To buttress its position, it cites to the standards adopted in other Circuits, particularly the Fourth, where a test of "substantial likelihood" was used. *See F.T.C. v. Atlantic Richfield Co.,* 549 F.2d 289, 291 (4th Cir. 1977). We, however, feel that the test used by the magistrate below more fully comports with the legislative intent. It insures that the courts will invoke their independent judgment in reviewing applications for preliminary injunctive relief without raising so strict a requirement that the statute's intended protection of the public interest will be frustrated.

■ The magistrate and the District Court also disagreed as to whether it was proper to consider National's probable exit from the market if the merger was enjoined as a factor in their consideration of whether the FTC was likely to ultimately succeed on the merits. The magistrate concluded that it was improper to consider this evidence. The magistrate recognized that in *United States v. General Dynamics Corp.,* 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), the Supreme Court held that such evidence was admissible under certain circumstances, but he accepted the FTC's argument that *Gen-*

---

6. The legislative history of § 13(b) of the Federal Trade Commission Act reveals that:

> The inclusion of this new language is to define the duty of the courts to exercise independent judgment on the propriety of issuance of a temporary restraining order or a preliminary injunction. This new language is intended to codify the decisional law of *Fed-*

*eral Trade Commission v. National Health Aids,* D.C., 108 F.Supp. 340 and *Federal Trade Commission v. Sterling Drugs, Inc.,* 2 Cir., 317 F.2d 669, and similar cases which have defined the judicial role to include the exercise of such independent judgment.

H.R. Rep. No. 624, 93d Cong., 1st Sess. 116 (1971) (Conference Report).

*eral Dynamics* was to be given a restrictive interpretation. The District Court, relying on its interpretation of *General Dynamics,* concluded that it was proper to consider this evidence. We concur in this interpretation.

The facts supporting the District Court's conclusion are not in dispute.

National presently has an extremely poor image among consumers in the Minneapolis-St. Paul area. Its Minneapolis-St. Paul area stores lost substantial amounts of money in each year between 1974 and 1978:

|  | Pretax Losses of the Minneapolis-St. Paul Stores Operated by National |
| --- | --- |
| 1974 | $1,298,000 |
| 1975 | $1,193,000 |
| 1976 | $ 161,000 |
| 1977 | $ 169,000 |
| 1978 | $1,240,000 |

On a store-by-store basis, National had pretax losses during 1978 in fifteen of the nineteen stores. Moreover, eleven of these stores have not operated at a profit at any time during the past five years, and an additional four stores have had only one or. two years of profitable operation within the past five years. In summary, almost 80% of National's stores in the relevant market have been major money-losers during the past five years.

National's nineteen stores in the relevant market are small in size, especially in comparison with their competition. They average only 13,751 square feet in selling area, while National's largest competitors operate stores that range in size from 20,000 to 92,000 square feet. Thus, National has found that it is difficult to compete effectively since the selection of stock items it must carry to be competitive has risen from 6,000 in the late 1950s and early 1960s (when most of National's Minneapolis-St. Paul area stores were built) to over 12,000.

Since 1967, National has attempted to revitalize its stores in the relevant market. In the process, National has closed or sold thirty-six stores. National's revitalization efforts also included certain operational and structural changes. For example, National began to offer stamps and games for its customers. It added additional price specials. The stores were given certain cosmetic changes, such as new paint jobs and a new corporate logo. National increased its advertising expenses, and its costs and its losses thereupon increased. It then decreased its advertising expenses; and while its advertising costs fell, its sales fell as well, leading to additional losses.

One of the problems facing National has been its inability to gain access to prime sites for new stores. In attempts to find new and better store sites, National increased its divisional real estate department in the Minneapolis Division to three full-time people. Their first detailed set of proposals was prepared in 1977. The Minneapolis Division real estate manager identified thirty-five potential sites to be pursued by National. In two and one-half years of effort, however, every one of these sites was investigated, yet only one lease was signed. The net results of the 1978 real estate activity were two stores closed and three within-the-wall remodelings. No new stores were built.

National is viewed by real estate developers as a "nonissue" and is "the very last [chain] that the developers come to," leaving it without a chance to gain prime sites. National ranks lowest of sixteen major food retailers in sales per store, while Applebaums ranks tenth lowest.

We conclude that under *General Dynamics* it was appropriate for the District Court to consider the above facts in its decision.[7]

In *General Dynamics,* the government challenged the merger of two companies which produced and sold coal. The govern-

---

**7.** The District Court's finding that National would leave the market if the merger was enjoined is not clearly erroneous. *See* Fed.R. Civ.P. 52(a). We note that in so finding, the District Court impliedly overruled the magis-

trate's finding that "National has the ability to expand and improve its operations if it chooses to do so." The District Court properly gave little weight to National's threat to leave the market if the merger was enjoined.

ment presented a case based on current market share statistics that supported a finding of undue concentration and a prima facie showing of a substantial lessening of competition. The Supreme Court found, however, that the important measure of competitive strength in the coal industry was not current market share but the extent of a company's uncommitted coal reserves. The acquired company had no coal reserves and was unable to obtain additional ones. Thus, the Court concluded, the acquired company was an insignificant factor as a competitor and the merger did not have an anticompetitive impact on the market.

In *General Dynamics,* the Court simply recognized that while market share is an important indicator of a firm's future competitive strength, other factors may discount its significance. *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 120, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); *United States v. International Harvester Co.,* 564 F.2d 769, 773–774 (7th Cir. 1977); *United States v. Consolidated Foods Corp.,* 455 F.Supp. 108, 135–136 (E.D.Pa.1978). As stated by the Court:

> Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete. In most situations, of course, the unstated assumption is that a company that has maintained a certain share of a market in the recent past will be in a position to do so in the immediate future. Thus, companies that have controlled sufficiently large shares of a concentrated market are barred from merger by § 7 [of the Clayton Act], not because of their past acts, but because their past performances imply an ability to continue to dominate with at least equal vigor.

415 U.S. at 501, 94 S.Ct. at 1195.

This position did not represent a radical departure from the Court's prior decisions. In *Brown Shoe Co. v. United States,* 370

U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court had noted:

> Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

370 U.S. at 322 n. 38, 82 S.Ct. at 7522 n. 38. *See also United States v. Continental Can Co.,* 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

In examining the imminent departure of National from the relevant market and the increased concentration that would result, the District Court was merely scrutinizing the "probable future" of the market. Obviously, if National had experienced such serious marketing problems in the Minneapolis-St. Paul area that it was leaving the area, its present market share was an inaccurate reflection of its future competitive strength. Moreover, when examining a merger, a court must necessarily compare what may happen if the merger occurs with what may happen if the merger does not occur. *See, e. g., United States v. Citizens & Southern National Bank, supra,* 422 U.S. at 121, 95 S.Ct. 2099; *United States v. General Dynamics Corp., supra,* 415 U.S. at 506, 94 S.Ct. 1186. The prospective loss of National from the relevant market if the merger is enjoined is a relevant factor in this comparison.[8]

### III. ABUSE OF DISCRETION

▮ The final question presented to the Court is whether the District Court abused its discretion in refusing to grant the requested injunctive relief. We hold that it did not. In addition to the relative market share statistics presented by the FTC, the District Court properly considered the following factors in its decision:

---

8. Although the FTC argues that National is attempting to assert a "failing company defense," we do not agree. The evidence was merely another factor going into the conclusion that the FTC was ultimately unlikely to succeed on the merits. *See United States v. General Dynamics Corp.,* 415 U.S. 486, 507–508, 94 S.Ct. 1186 (1974).

(1) National is a weak competitor in the relevant market.[9] The FTC expert testified that one possible result of the merger might well be that Applebaums would be overburdened by National's declining competitive position rather than that National would be uplifted by its acquisition.

(2) The Minneapolis-St. Paul market is a "relatively competitive one" when compared to other food retailing markets. The combined market share of the top four retail grocery stores, which had grown from 31.4% in 1954 to 45.2% in 1972, has leveled out and declined slightly. This is a considerably lower level of concentration than that found in most of the standard metropolitan statistical areas studied in preparation of the Joint Economic Committee of Congress Study (1977). This is significant because that study was relied upon by the FTC for the conclusion that there was a positive relationship in the food retail business between four firm concentration levels and increased prices and profits.[10] The positive relationship between increased concentration and decreased competition had not been demonstrated, however, where the overall market concentration was relatively low. There was considerable conflict in the evidence as to whether increases in the top four firms' market concentrations in the interval from 40% to 50% of the total market, implied more than marginal increases in price, that is, decreases in competition.

The Minneapolis-St. Paul retail grocery store market is marked by an active second tier of competitors. A food store consultant, Eliot Olson, based in the Minneapolis-St. Paul area, testified that

> from a standpoint of the viability and the strength of the independents Minneapolis-St. Paul is very unique.

The record discloses that sales of the sixth through the ninth largest firms expanded more rapidly than sales for the top four firms or for the market as a whole from 1972 through 1978. Sales of those firms increased 206.3%, while sales of the top four firms increased only 73.6%.

Although statistically the National-Applebaum merger would make National the leading firm in the market, two other competitors would have substantially the same market shares. National would have 14.2% of the market as compared to Red Owl's 13.9% and Country Club's 13.8%. Thus, even if National is able to maintain its statistical position after the merger, it will still be faced with vigorous competition from the two other leading firms as well as from the strong and growing second-tier firms.

(3) Barring the completion of the merger, National would probably be forced out of the relevant market. In that event, some of National's market share would be captured by the top four firms, and the market share of the top four firms would rise from the current 44.5% to at least 47.5%. In comparison, the four-firm market share after the merger is expected to be 49%.

## IV. CONCLUSION

The preliminary injunction issued by this Court is continued for a period of ten days to permit the FTC to petition the United States Supreme Court for further review of this action. The injunction is dissolved at the expiration of the ten days.

The District Court's refusal to grant an injunction pending completion of the administrative proceeding before the FTC is affirmed.

9. In *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Court enjoined the merger of "two highly successful, expanding and aggressive competitors." *Id.* at 272, 86 S.Ct. at 1479. Both companies, however, had enjoyed highly successful histories and were the third and sixth ranking retail grocery chains in the Los Angeles area. Their merger would have made them the second largest chain in the market. *Id.*

10. This contention, too, was disputed in the evidence. Dr. Morris Adelman, an expert for the respondents, testified that the JEC Study failed to demonstrate any positive relationship between concentration and prices and profits.