17 F.Supp.2d 937 (1998)
FEDERAL TRADE COMMISSION, et al., Plaintiffs,
v.
TENET HEALTHCARE CORPORATION, et al., Defendants.
No. 4:98CV709 CDP.
United States District Court, E.D. Missouri, Eastern Division.
July 30, 1998.
*938 *939 Garry R. Gibbs, Steven Osnowitz, Gary H. Schorr, Geoffrey Oliver, Robert F. Leibenluft, Federal Trade Commission, Washington, DC, Penny G. Newman, F. Martin Dajani, Attorney General of Missouri, Kansas City, for Federal Trade Commission, State of Missouri, By and through its Attorney General, Jeremiah W. (Jay) Nixon, plaintiffs.
G. Keith Phoenix, Managing Partner, Sandberg and Phoenix, St. Louis, George T. Manning, Darryl R. Marsch, Adrian Wager-Zito, L. Trammell Newton, Jr., Charles A. James, Jones and Day, Washington, DC, Thomas Demitrack, Jones and Day, Cleveland, OH, for Tenent Healthcare Corporation, Poplar Bluff Physicians Group, Inc. dba Doctors Regional Medical Center, defendants.

MEMORANDUM AND ORDER
PERRY, District Judge.
Plaintiffs Federal Trade Commission (FTC) and the State of Missouri seek a preliminary injunction under § 13(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 53(b), to enjoin the proposed merger of the only two commercial hospitals in Poplar Bluff, Missouri. Lucy Lee Hospital is already owned by defendant Tenet Healthcare Corporation, which wishes to purchase Doctors Regional Medical Center (DRMC), currently owned by defendant Poplar Bluff Physicians Group, Inc. Both plaintiffs contend that the proposed merger would substantially lessen competition between acute care hospitals in the Poplar Bluff area in violation of § 7 of the Clayton Act, 15 U.S.C. § 18. The State of Missouri also alleges violations of the Missouri antitrust statute, Mo.Rev.Stat. § 416.031 (1994). Plaintiffs ask this Court to enjoin the proposed merger until completion of FTC administrative proceedings.
Plaintiffs filed separate actions in April 1998, which were consolidated for expedited discovery and hearing. Because Tenet and DRMC agreed to refrain from closing on the proposed acquisition until five days after entry of this order, plaintiffs did not seek a temporary restraining order. The Court held a five-day hearing on the request for preliminary injunction.
Based on all of the evidence and the arguments presented, the Court concludes that the plaintiffs have met their burden of showing that the FTC is likely to succeed on the ultimate issue of whether the merger would have the effect of substantially lessening competition in the relevant market. Accordingly, having weighed the equities and considered the public interest, the Court will issue the preliminary injunction.

I. Factual Background

On April 2, 1997, defendant Tenet Healthcare Corporation, which currently owns Lucy Lee Hospital, entered into an agreement to acquire DRMC by purchasing all of the voting shares of the Poplar Bluff Physicians Group, Inc., for $40.5 million. Except for a hospital owned and operated by the Veterans Administration, Lucy Lee and DRMC are the only two hospitals in Poplar Bluff, Missouri. They are both general acute care hospitals providing primary and secondary care services.
Poplar Bluff is the county seat of Butler County, located in Southeast Missouri. Poplar Bluff has a population of approximately 17,000 persons, while Butler County has approximately 40,000 persons. Poplar Bluff, the largest city in a several-county area, has a number of manufacturing operations and operates as the cultural and economic center of the surrounding area. Driving distances to the next largest cities in any direction  which include Sikeston and Cape Girardeau, Missouri, to the east and northeast, and Jonesboro, Arkansas, to the southeast  are generally in excess of one hour. Like most rural areas in the United States, the region is not wealthy, and has a large number of lower income and elderly residents.
Lucy Lee has 201 licensed beds, 185 of which are staffed. Lucy Lee operates ten out-patient clinics in the surrounding counties. Most of these out-patient clinics are *940 staffed by a nurse practitioner, and physicians are on site only during limited hours. Some of the clinics are not opened or staffed on a full-time basis. Lucy Lee's average daily census in 1994 was 75, in 1995 was 76, and in 1996 was 104.
DRMC has been a for-profit hospital during its entire existence, but has changed hands several times. In 1990, its current owners, a group of physicians who had previously and were then practicing at DRMC, purchased the hospital for approximately $20 million. DRMC has 230 licensed beds, 187 of which are staffed. The evidence shows that DRMC's average daily census in 1994 was 106, in 1995 was 99, in 1996 was 95, and in 1997 was 77. DRMC, like Lucy Lee, operates several rural health clinics and a mobile clinic in surrounding counties. Like Lucy Lee's clinics, these clinics are staffed by nurse practitioners who work under the supervision of physicians available only on a part-time basis.
There are four small rural hospitals within fifty miles of Poplar Bluff. None of these has more than 50 staffed beds. Each of these hospitals has few admitting doctors and provides only a very basic level of primary care services and limited, if any, secondary care services.[1] Also approximately fifty miles away is Tenet-owned Twin Rivers Medical Center in Kennett, Missouri, which has 118 staffed beds, 20 admitting physicians on staff and an average daily census of 44 patients.
Within a sixty-five "air" mile radius of Poplar Bluff (which can be up to 95 driving miles) there are fourteen other hospitals, ranging in size from tertiary care hospitals (in Cape Girardeau, Missouri, and Jonesboro, Arkansas) to small primary-care hospitals.
St. Louis, Missouri, is approximately 145 driving miles from Poplar Bluff and has a large number of hospitals, ranging from primary care to quaternary care hospitals. Both Barnes-Jewish-Children's Hospital in St. Louis, a major teaching hospital affiliated with Washington University Medical School, and Tenet-owned St. Louis University Hospital, also a major teaching hospital, provide all levels of care including the highest level of specialized care such as organ transplants. Similarly, Memphis, Tennessee, approximately 150 miles from Poplar Bluff, has Baptist Memorial Hospital, a major hospital which also provides highly specialized care.
The parties agree that managed care organizations have a very significant, if not determinative, effect on patients' selection of hospitals. During the hearing, the parties presented testimony and written evidence from numerous third-party payors, including commercial health insurance plans, network providers, and self-insured companies offering health insurance to employees. Most of the third-party payors in the Poplar Bluff region offer their participants some version of a preferred provider organization (PPO) health plan. A standard PPO arrangement requires the participant to make a co-payment, typically 20% of the cost, and to pay a deductible, which might range anywhere from $100 to $500. The PPOs provide their participants with incentives to use in-network health care providers by reimbursing a lower percentage of the fees, such as 60% or 70%, if the individual chooses to use an out-of-network provider. Although the percentages for the PPO payments varied, the general scheme is the same.
There are few true Health Maintenance Organizations (HMOs) currently operating in Southeast Missouri. Hospitals and major providers in the area have been very resistant to managed care generally, and especially to HMOs. The evidence showed, however, that managed care is thriving in Southeast Missouri and that numerous PPOs contract with and obtain discounts from various health care providers. It is reasonable to expect that HMOs, along with other forms of managed care, will increase in the area as they have in the rest of the country and state.
The evidence showed that Lucy Lee and DRMC have a long history of competing with one another, and actively compete for thirdparty *941 payor contracts. The large employers, health care networks, and insurance companies have been very successful in negotiating discounts with the Poplar Bluff hospitals. The payors attribute their success in obtaining hospital discounts to the fierce competition between the two hospitals. Several witnesses testified that the rates they were able to obtain in Poplar Bluff were significantly lower than rates elsewhere in the country or the state. To counter the significant payor testimony presented by plaintiffs, defendants presented one representative from a large national corporation with a manufacturing facility in the region, who strongly disagreed with plaintiffs' witnesses. This witness credibly testified that he believed his company would be able to continue to negotiate savings from the merged entity, and that efficiencies from the merger would benefit competition. This witness's company, however, provides an impressive benefit package to its work force in an attempt to hire quality employees, keep them with the company, and avoid unionization. Because of this, the company is uniquely sensitive about providing a very high level of services, a very low co-payment, and maximum provider choice for its employees. As a nationwide company with thousands of employees, it understandably gains a competitive advantage in negotiating with major suppliers such as Tenet, because it can negotiate contracts in more than one location. In contrast, many of plaintiffs' witnesses owned much smaller local companies, and these witnesses believed that their negotiating power would be greatly diminished if there were only one hospital provider available in the area. It is clear that the competitive pressures between the two hospitals in the past has benefited the consumers of the region and has kept prices significantly lower than those in other areas.

II. Discussion

Section 7 of the Clayton Act provides in relevant part that "no person ... shall acquire the whole or any part of the assets of another person ... where the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. Where a Clayton Act violation is alleged, Section 13(b) of the FTC Act provides that a district court may grant a preliminary injunction of a proposed merger "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest ...". 15 U.S.C. § 53(b).
To demonstrate a likelihood of ultimate success for the purpose of obtaining a preliminary injunction under § 13(b), the Federal Trade Commission must raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." F.T.C. v. National Tea Co., 603 F.2d 694, 698 (8th Cir.1979); F.T.C. v. Freeman Hosp., 69 F.3d 260, 267 (8th Cir.1995).
The State of Missouri's complaint also alleges violations of the Clayton Act of Missouri's anti-trust act, Mo.Rev.Stat. § 416.031 (1994), which generally prohibits monopolization. The parties have assumed that the state-law claim should be analyzed by the same standards governing the Clayton Act claim, and the Court agrees with that assumption and discusses the case accordingly.

A. Relevant Market Analysis

"The determination of the relevant market is a `necessary predicate' to a finding of a Clayton Act violation." Freeman, 69 F.3d at 268, citing U.S. v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Plaintiffs must identify a credible relevant market before any preliminary injunction issues. See Freeman, 69 F.3d at 268. The relevant market consists of two components, a product market and a geographic market. A product market is defined by the "reasonable interchangeability of use ... between ... the product itself and substitutes for it." Brown Shoe Co. v. U.S., 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). A geographic market is the geographic area "to which customers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." Morgenstern v. Wilson, 29 F.3d 1291, 1296 *942 (8th Cir.1994), cert. denied, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995).
Evidence addressing where consumers actually go, as opposed to evidence of where they could practicably go, is insufficient as a matter of law to define the relevant geographic market. Freeman, 69 F.3d at 269-70; Morgenstern, 29 F.3d at 1296; Bathke v. Casey's General Stores, Inc., 64 F.3d 340, 345 (8th Cir.1995). Instead, market definition requires an examination of practical alternatives from a consumer's perspective. In the case of health care entities, consumers properly include managed care coalitions and third-party payors. Id. at 345; Freeman, 69 F.3d at 270 n. 14.

1. Product Market

The parties agree that the product market is general acute care in-patient hospital services, including primary and secondary services, but not including tertiary or quaternary care hospital services. Thus the dispute in this case is over the geographic market.

2. Geographic Market

It is undisputed that DRMC and Lucy Lee draw 90% of their patients from 31 zip codes in Butler County and portions of the surrounding seven counties. Plaintiffs argue that this 90% service area, which comprises approximately a 50 mile radius from Poplar Bluff, is the relevant geographic market. Plaintiffs' proposed geographic market includes seven hospitals: DRMC and Lucy Lee and the closest five rural hospitals, including Tenet-owned Twin Rivers.
Defendants, on the other hand, contend that the relevant geographic market is much broader and actually consists of a 65 mile radius from Poplar Bluff (as the crow flies).[2] Defendants' proposed market includes those hospitals in plaintiffs' proposed market and fifteen others, including the much larger hospitals in Jonesboro, Arkansas, Sikeston and Cape Girardeau, Missouri, all of which provide tertiary care, and Barnes-Jewish-Children's Hospital in St. Louis, Missouri, a major teaching hospital providing quaternary care.[3]
It is undisputed that a significant number of patients within even plaintiffs' proposed geographic market obtain at least some hospital services outside the area. Defendants' evidence shows that in 25 of the 31 zip codes which comprise the hospitals' 90% service area, 20% of the patients have gone somewhere other than DRMC or Lucy Lee for hospital care. The crux of the parties' dispute in this case is over why patients go elsewhere, and therefore whether the surrounding hospitals are "practical alternatives" to whom patients would turn if the merged entity raised prices.
The statistical evidence presented in this case does not provide a definitive answer as to why patients go to hospitals outside Poplar Bluff for care. Plaintiffs argue that it is for emergency or specialist care or for services otherwise not available in Poplar Bluff. Defendants argue that patients seek treatment outside the Poplar Bluff area because they perceive Lucy Lee and DRMC to be inferior to the hospitals located in larger cities such as Cape Girardeau and St. Louis, not because they could not have obtained these services in Poplar Bluff. The Court finds that the available statistical data cannot, by itself, provide the answer to this question, although each side has analyzed the data in a manner to support that party's position. Instead the Court must take the evidence as a whole, and consider the anecdotal evidence in conjunction with the statistical data and expert testimony. In doing so, the Court finds plaintiffs' evidence to be more credible, logical, and persuasive, for a number of reasons.[4]

*943 a. The Anecdotal Evidence

Plaintiffs' anecdotal evidence consisted primarily of the testimony of third-party payors and employers within the Poplar Bluff area who stated that their participants and employees predominantly used Lucy Lee and DRMC hospitals for primary and acute care services, and went to other hospitals only to obtain services that are unavailable in the Poplar Bluff area or when referred by specialists outside the Poplar Bluff area. These witnesses believed that their participants use Lucy Lee and DRMC because they are conveniently located and their family physicians have privileges at one or the other local hospital. For these reasons, the witnesses testified that they do not believe Poplar Bluff patients would use hospitals outside the Poplar Bluff region as alternatives to Lucy Lee and DRMC in the event of a price increase by the merged hospital.
The third-party payors also agreed that they were able to obtain significant discounts because of the intense competition between Lucy Lee and DRMC, often by agreeing to exclude the other local hospital from their networks. All of the plaintiffs' witnesses believed that in the absence of this competition, they would be unable to negotiate the same level of discounts that they currently have with DRMC and Lucy Lee. The plaintiffs' employer witnesses testified that because of employee demand for a hospital located in Poplar Bluff, they would not attempt to steer their employees to hospitals outside the Poplar Bluff region in response to a 10% price increase, but instead would either absorb the cost of the increase or pass the increase along to their employees in the form of higher premiums or deductibles.
Through affidavits, plaintiffs presented testimony from hospital administrators outside the proposed geographic market to determine how their hospitals might respond to a 10% price increase by hospitals in the Poplar Bluff area. These administrators testified that they would not expect an increase in their acute care patient admissions if the Poplar Bluff hospitals were to merge and raise prices by 10%. Moreover, these witnesses averred that they would not expect their hospitals to be affected in any way by a 10% price increase by the Poplar Bluff hospitals.
The plaintiffs' anecdotal testimony is confirmed by common sense. At some point, a hospital ceases to become a practical alternative for general acute care because of distance. In this case, the larger hospitals are well over an hour's drive time, on secondary roads, from Poplar Bluff itself. Obviously, some consumers in plaintiffs' defined market area  for example, those in its eastern regions  live closer to the larger hospitals that defendants argue are practical alternatives, but many in the western area of plaintiffs' defined regions live over two hours from the larger hospitals in defendants' proposed market. This evidence supports the conclusion that sufficient numbers of consumers in the Poplar Bluff region would not practicably turn to these larger hospitals for acute care services in the event of a price increase by Lucy Lee and DRMC.
The evidence also supports plaintiffs' contention that the larger hospitals are not practical alternatives because they would still be more expensive than the Poplar Bluff hospitals, even assuming a 10% price increase. Some third-party payors pay significantly more for services obtained at the larger hospitals than they pay for the same services at the Poplar Bluff hospitals. For this reason, the third-party payors would have no incentive to steer participants to the larger hospitals if prices increased 10% or more in Poplar Bluff.
The evidence also shows that patients are loyal to their primary physicians, and are unwilling to use a hospital if they would be required to change doctors. For this reason, Poplar Bluff patients would be unwilling to use alternative hospitals outside of the proposed geographic market because their physicians lack hospital admitting privileges at these hospitals.
The small rural hospitals in the area are also not practical alternatives, because they offer a very limited range of services. For example, Dexter Memorial Hospital and Piggott *944 Community Hospital offer basic primary care services, but do not offer obstetrics or many cardiac services. Most admissions to Ripley County Memorial Hospital are for emergency treatment. In addition, these hospitals lack accreditation from the Joint Commission on Accredition of Healthcare Organizations (JCAHO), which is required by some managed care programs to include a hospital in network. This evidence supports the testimony of the market participants that Poplar Bluff area patients view these hospitals as "stabilization" clinics.

b. The Statistical Evidence

Defendants concede that the "testimony of market participants is relevant to a determination of a proper geographic market ...". Freeman, 69 F.3d at 270. In this case, however, defendants urge the Court to disregard the testimony of the market participants as unreliable because it is not based on a review of statistical evidence. The Court agrees that the statistical evidence is important, but finds that, to the extent conclusions can be drawn from it, it supports plaintiffs' other evidence.
Plaintiffs' economist, Dr. Lawrence Wu, reviewed patient use statistics and found that 84% of the patients residing within the Poplar Bluff area use hospitals within the Poplar Bluff area. This type of patient flow analysis is known as the Elzinga-Hogarty test. The Court recognizes that patient use statistics, standing alone, provide only a static picture of the market. See id. at 269. Dr. Wu's statistical analysis, however, is a proper first step in the determination of the relevant geographic market. Dr. Wu built upon the patient use statistics and properly considered the future effects of a price increase by reviewing other data, including the DRG data discussed below and data showing that Poplar Bluff patients admitted to larger hospitals were disproportionately admitted by specialists, rather than by primary care physicians. Dr. Wu concluded that the merged hospitals would be able to profitably raise prices, and that a 10% price increase was probable.
Both parties reviewed and rely on Diagnostic Related Group ("DRG") data to support their respective conclusions. The DRG system assigns a single code to most inpatient diagnoses and/or major procedures, and is used by hospitals and insurers, including Medicare, to classify patients for payment. DRG is a somewhat imprecise approximation of care complexity because various diagnoses are often grouped together as one code. Additionally, of course, hospitals may code differently. However, the Eighth Circuit Court of Appeals has approved of the use of this data to test a proposed market. See id. at 270-71.
Plaintiffs' witness Alan Bruce Steinwald examined available data, based on DRG classifications and several other indicia of care complexity, to determine whether the data supported plaintiffs' conclusion that patients leave the area for specialty or more complex care not available in Poplar Bluff. Obviously, some DRG classifications are not performed at all in Poplar Bluff (heart transplants, for example). Most DRGs, however, will appear both at the Poplar Bluff hospitals as well as at tertiary care hospitals, so other measures of complexity must also be studied. Steinwald's analysis showed that for DRGs which were performed at Poplar Bluff, the other measures of care complexity, including length of stay, total charges per discharge, number of procedures performed, the Deyo Index of Severity, and something called the Mortality Predictor, all showed significantly more complex problems being treated at the Cape Girardeau and St. Louis hospitals. Only one index, number of secondary diagnoses, was higher in Poplar Bluff. In other words, Steinwald's analysis showed that people within plaintiffs' proposed market went outside the region to obtain care for more severe or specialized problems. Additionally, the analysis showed that more of the complicated DRGs appeared at the larger hospitals, while more of the less complicated DRGs appeared at the Poplar Bluff hospitals. Defendants' expert attempted to challenge these findings by "disaggregating" them, but the Court finds that in general, even accepting some of the limitations suggested by defendants' expert, the DRG data supported plaintiffs' argument.
Defendants' expert witness, Dr. Barry Harris, concluded from his statistical analysis *945 that consumers in the Poplar Bluff area could easily defeat any proposed price increase by the merged entity because too many of its patients live in what he termed "contestable" zip codes. These are zip codes within the hospitals' 90% service area where at least 20% of the patients currently utilize hospitals other than Lucy Lee and DRMC. Dr. Harris concluded that enough patients in these zip codes would switch hospitals if Lucy Lee and DRMC raised prices so that a price increase would not be profitable.
Based on all the evidence, the Court agrees with plaintiffs that this "contestable" zip code model is problematic. The primary weakness of the "contestable" zip code model is that its assumptions prevent it from attempting to answer the real question before the Court: whether the hospitals outside plaintiffs' proposed market constitute practical alternatives to the Poplar Bluff hospitals. Dr. Harris deems a zip code "contestable" if at least 20% of the patients residing within that zip code went to any hospital other than Lucy Lee or DRMC, regardless of the type of treatment sought. Thus, a zip code may be considered "contestable" even if 20% of the patients sought treatment out of the area for tertiary or quaternary services, which the parties agree are not available in the Poplar Bluff hospitals. Because this is one of the critical questions that must be answered by the market analysis, it is improper to build this assumption into the statistical model.[5]
Defendants attempted to verify Dr. Harris' statistical analysis by conducting a telephone survey of residents within the Poplar Bluff service area to determine their propensity to switch hospitals in response to a price increase at Lucy Lee and DRMC. The survey responses, however, do not provide any insight into the issue of how hospitals are selected or how consumers would react to a price increase. Respondents were asked whether they would be willing to go to any one of eleven named hospitals outside Poplar Bluff if the Poplar Bluff hospitals increased the consumers' out of pocket expenses by $200. Defendants contend that they used a $200 increase because the Horizontal Merger Guidelines, which are issued by the United States Department of Justice and the FTC, indicate the average cost of a hospital stay to be $4,000, and a hypothetical 5% increase in the cost of the hospital stay would therefore amount to a $200 price increase. However, a standard commercially insured patient with a 20% co-payment would only pay an additional $40, not $200, in response to a 5% increase in a $4,000 hospital bill. Moreover, the survey failed entirely to account for the most significant factor in hospital selection  the influence of third-party payors. It also failed to control for other variables that may influence a consumer's choice of hospitals. There were several more basic technical problems with the survey as well.[6] The survey results are not probative and the survey is wholly unhelpful.
From all the evidence, the Court concludes that plaintiffs' proposed geographic market is appropriate, and that defendants' proposed market is unsupported by the evidence and is inconsistent with the economic realities of Southeast Missouri.

B. Competitive Effects

To obtain a preliminary injunction in a § 7 case, plaintiffs must also demonstrate that the proposed merger would result in a significant concentration of power in the relevant market and vest an undue share of the market in the merged entity. F.T.C. v. University Health, Inc., 938 F.2d 1206, 1218 (11th Cir.1991). As market share and concentration in a particular market increase, the likelihood that the firms in the market can exercise market power to manipulate price also increases. See U.S. Dept. of Justice & Federal Grade Commission, Horizontal *946 Merger Guidelines § 1.5 (1997) (Merger Guidelines).
Market concentration can be measured by applying the Herfindahl-Hirshman Index ("HHI") to the relevant geographic market to yield a numerical measure of concentration. F.T.C. v. Butterworth Health Corp., 946 F.Supp. 1285, 1294 (W.D.Mich.1996), aff'd without published opinion, 121 F.3d 708, 1997 WL 420543 (6th Cir.1997). The HHI is calculated by summing the squares of the individual market shares of all participants. The Merger Guidelines define a market as "highly concentrated" if the HHI after the merger exceeds 1800 points and presume a merger will likely enhance market power if the merger produces an increase in the HHI of more than 100 points. Merger Guidelines § 1.5. A merger resulting in a highly concentrated market presumptively raises antitrust concerns and "must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." U.S. v. Philadelphia Nat. Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).
The merger of Lucy Lee and DRMC is presumptively illegal under this test because the merged entity would acquire 84% of the relevant market. The post-merger HHI would be at least 6,000 and could exceed 7,000. The HHI after the merger would increase at least 2,700 points and could exceed 3,200 points. The post-merger market concentration would far exceed the threshold for a highly concentrated market contained in the Merger Guidelines. Defendants do not dispute these mathematical calculations, but argue that the concentration level is greatly overstated because plaintiffs have improperly defined the relevant market. Because the Court has found plaintiffs' proposed market to be proper, however, defendants' argument fails.
The presumptively anticompetitive effects of the proposed merger are confirmed by the anecdotal and other evidence summarized above. Lucy Lee and DRMC are each other's primary competitor within the market, and in the past each has been successful in negotiating managed care contracts excluding the other. At times Lucy Lee and DRMC compete directly for patients by waiving co-payments that a patient may incur by using their hospital. In this way, Lucy Lee and DRMC compete for patients even where managed care steering mechanisms may already be in place. By eliminating this direct competition, the merged hospital will have the ability to exercise market power. Additionally, the surrounding smaller hospitals would be unable to constrain prices post-merger because they are much smaller than Lucy Lee and DRMC, lack comparable services, are currently experiencing financial difficulties, and would collectively have an insignificant market share after the merger.
The Court finds that the merger is likely to have anti-competitive effects because the intense competition between Lucy Lee and DRMC, which has resulted in significant benefits for the consumer and encouraged efficiency, will be eliminated. The advent of managed care in the Poplar Bluff region has forced Lucy Lee and DRMC to become more efficient, because some of the managed care programs regularly review hospital utilization reports and implement cost control programs to eliminate the inappropriate use of hospital services. The competition has promoted improved hospital quality and service. To compete within the market, Lucy Lee and DRMC have routinely added new services, recruited high-quality physicians to an area that traditionally would have difficulties attracting physicians, and established rural outreach clinics.
Entry into the market is unlikely to occur from new hospitals, from the smaller hospitals in the Poplar Bluff region, or from the larger hospitals outside the geographic market. For reasons stated above, the four other hospitals not owned by Tenet in the relevant market are unlikely to increase beds, services, or clinics in any significant way in response to a price increase by the merged hospital. Similarly, representatives of the hospitals outside the relevant market have testified that their hospitals would not establish new clinics to attract Poplar Bluff patients in the event of a price increase within the Poplar Bluff market, and the Court finds this testimony to be entirely logical. Additionally, the state regulatory process effectively *947 precludes construction of a new hospital or the expansion of an existing hospital in the foreseeable future. Under Missouri law, a person must obtain a certificate of need (CON) before opening a new hospital or increasing the bed capacity of an existing hospital. Mo.Rev.Stat. § 197.300 et seq. (1994). The approval process for a CON application can take over two years, excluding construction time. The State of Missouri generally will not approve a CON application unless it first determines that a need for beds or services exists. From the evidence it is clear that no need exists for additional hospital services or beds in the Poplar Bluff area.

C. Defendants' Affirmative Defenses

Defendants raise two affirmative defenses: 1) the acquisition will not substantially lessen competition because DRMC's poor financial condition limits its effectiveness as a competitor; and 2) the efficiencies resulting from the proposed merger will outweigh any anticompetitive effects which may result from the merger. For the reasons discussed below, the Court finds that the defendants have failed to meet their burden of proving either affirmative defense.

1. Defendants' "Flailing Firm" Defense

Financial weakness may constitute a defense to an antitrust suit only where "the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the government's prima facie case." University Health, 938 F.2d at 1221; see also, U.S. v. General Dynamics Corp., 415 U.S. 486, 503-04, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).[7]
DRMC's financial condition does not justify application of this defense. DRMC has made an increasing profit over the last three years, despite a slight decline in its inpatient days. Moreover, its 1997 budget predicts growing revenues and an increasing cash balance. Despite being highly lever-aged, DRMC has been able to service its debt. DRMC's cash reserves and short-term investments substantially exceed the industry average and could be applied to reduce its long-term debt by approximately one-third.
The evidence demonstrates that DMRC has successfully adapted to competitive pressures and should be well positioned to do so in the future. For example, DRMC has managed to effectively compete for managed care contracts, while at the same time increasing its financial performance, in part through aggressive cost management. There is no evidence that DRMC will not remain a viable competitor for these contracts as managed care continues to penetrate the Southeast Missouri healthcare market.
Finally, the "flailing firm" defense is inapplicable because many of the factors which allegedly limit DRMC's ability to compete affect the market as a whole. Although defendants point to declines in patient days, admissions, and census as evidence of DRMC's inability to effectively compete, the evidence showed a nationwide trend towards shorter and less frequent inpatient stays. Similarly, defendants contend that the advent of managed care into the Poplar Bluff region and recent or expected adjustments to Medicare and Medicaid reimbursement methods will limit DRMC's ability to compete within the relevant market. Again, these trends affect the market as a whole, and there is no evidence that DRMC will lose its relative share of the market in response to these competitive pressures. Without the requisite showing that DRMC's financial weakness would reduce its market share to a level that would undermine the government's prima facie case  a showing that has not been made here  the "flailing firm" defense does not apply.

*948 2. Defendants' Efficiencies Defense

Defendants also attempt to justify the merger through an efficiencies defense. Efficiencies provide a defense to a merger only where the acquisition "would result in significant economies and that these economies ultimately would benefit competition and, hence, consumers." University Health, 938 F.2d at 1223. For the following reasons, the expected efficiencies do not justify the proposed merger in this case.
Defendants contend that excess bed capacity demonstrates that DRMC and Lucy Lee are underutilized, inefficient hospitals. The Court disagrees. Inpatient occupancy rates are no longer an accurate measure of hospital efficiency. Hospitals nationwide provide less acute inpatient hospital care and treat more patients on an outpatient basis or through post-acute care. Inpatient occupancy rates have declined in hospitals across the country, and excess bed capacity is common. Despite declines in inpatient utilization, profits at Lucy Lee and DRMC have steadily increased, in part because the hospitals have expanded their outpatient services. The hospitals have implemented cost-saving measures such as flexible staffing and using empty beds for outpatient services. This evidence suggests that the hospitals are being operated on an efficient basis, despite the decline in in-patient days.
To the extent that eliminating unused beds would substantially cut costs and result in increased efficiency for Lucy Lee and DRMC, the Court finds that the hospitals can successfully make such reductions now without merging. Accordingly, these projected efficiencies cannot justify the merger. See University Health, 938 F.2d at 1222 n. 30; Merger Guidelines, § 4.0.
Defendants claim that the proposed merger will allow Tenet to bring open heart surgery and other tertiary services to Poplar Bluff. These alleged benefits, even if possible, cannot justify the proposed merger because the relevant market in this case includes acute care services, not tertiary care services. See Philadelphia Nat. Bank, 374 U.S. at 371, 83 S.Ct. 1715 (alleged procompetitive consequences in one market do not justify anti-competitive effects in the relevant market). Moreover, the Court finds that many of the projected efficiencies would not benefit Poplar Bluff consumers. For example, defendants claim that the merger will increase efficiencies by decreasing operating costs and avoiding capital costs. However, the merged hospital is unlikely to pass these savings on to its consumers absent competitive pressure to lower prices.
Defendants also contend that the proposed merger will generate efficiencies by consolidating services and reducing staff levels. After careful consideration of the testimony and reports submitted by the two parties' experts on this issue, the Court agrees with plaintiffs that defendants' claimed cost savings are too speculative and unsubstantiated to be relied upon.

D. Balancing the Equities

In deciding whether to issue a preliminary injunction under § 13(b) of the Federal Trade Commission Act, the Court is required to balance the equities. 15 U.S.C. § 15(b). A court may properly consider both public and private interests, Freeman, 69 F.3d at 272, although public interests are to be accorded greater weight in the balance. National Tea, 603 F.2d at 697. Public interests may include the interest in maintaining competitive prices, the strong enforcement of antitrust laws and the difficulties of undoing a merger subsequently found to be unlawful. Id. These interests must be balanced against the hardships imposed upon the defendants if they are not allowed to immediately consummate the merger. Once the Court concludes that the plaintiffs have raised serious and substantial questions about the legality of the proposed merger, the defendants "face a difficult task in justifying the nonissuance of a preliminary injunction." University Health, 938 F.2d at 1225. Finally, it must be remembered that this Court's "task is not to make a final determination on whether the proposed [acquisition] violates Section 7, but rather to make only a preliminary assessment of the [acquisition]'s impact on competition." Id. at 1218.
On balance, the Court concludes that the public interest in favor of issuing the preliminary *949 injunction outweighs the harm that would result to the defendants if the preliminary injunction were issued.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs' motions for preliminary injunctions [# 23, # 25] are granted.
IT IS FURTHER ORDERED that the request for permanent injunctive relief by plaintiff State of Missouri is dismissed, without prejudice, at plaintiff's request.
Neither party shall recover any taxable costs of this action from the other.
NOTES
[1] Several of the witnesses described these hospitals as little more than rural clinics or "stabilization" centers. The least successful, the Reynolds County Hospital, has only one admitting physician on staff and its average daily census for 1996 was only 2 persons. The other three hospitals have average daily censuses ranging from 10 to 17 persons.
[2] As set forth above, this 65 "air mile" radius includes places up to 95 driving miles from Poplar Bluff.
[3] Because DRMC has a referral agreement with BJC, the evidence showed that a disproportionate number of persons referred to specialty care from DRMC went to BJC in St. Louis, rather than to closer specialists in, for example, Cape Girardeau.
[4] There is no doubt that the government agencies in this case were "out-lawyered" by the defendants. As the trier of fact and judge of equity, however, the Court must carefully weigh the evidence, the law, and the equities, and must, to the extent possible, disregard any differences in levels of skill and preparation by the attorneys. The Court has done so here.
[5] Similarly, defendants' argument regarding critical loss likewise assumes the answer to the ultimate question. Plaintiffs do not disagree with defendants' critical loss calculation, but they correctly point out that defendants' assumption that patients choose hospitals solely on the basis of price is not supported by the evidence.
[6] For example, the actual survey response rates were not maintained, some of the questions or combinations of questions resulted in nonsensical responses, and the results were most likely influenced by the phenomenon of "yea-saying."
[7] Defendants denominate DRMC a "flailing firm," presumably to distinguish their claimed defense from the "failing firm" defense, which they concede does not apply in this case. The "failing firm" defense to a merger applies only in the limited circumstance where defendants demonstrate a grave probability of business failure and the absence of any other prospective purchaser. Citizen Pub. Co. v. U.S., 394 U.S. 131, 136-38, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).