SPENCER PRESS, INC. *vs.* UTICA MUTUAL INSURANCE
COMPANY & others.[1]

No. 95-P-2017.

Middlesex. December 5, 1996. - May 16, 1997.

Present: PERRETTA, KASS, & JACOBS, JJ.

*Insurance,* Coverage, Errors and omissions clause. *Indemnity. Estoppel. Consumer Protection Act,* Insurance.

An exclusionary clause in a policy of commercial liability insurance oper-
ated to preclude coverage for damage caused during production to the
insured's own product [632-635], and there was thus no basis for any li-
ability under G. L. c. 93A and c. 176D for the insurer's alleged failure
to investigate or settle the claim in good faith [635-636].
There was no merit to an insured's claim that it had reasonably relied to its
detriment on a representation asserted to have been made by its insurer
with respect to coverage that the insurer had not in fact made. [635]

CIVIL ACTION commenced in the Superior Court Depart-
ment on August 30, 1984.

The case was heard by *Wendie I. Gershengorn,* J.

*Walter R. May, Jr.* (*Mark C. McCrystal* with him) for the
plaintiff.

*John G. Ryan* (*Susan E. Ireland* with him) for the Utica
Mutual Insurance Company.

KASS, J. We decide that the errors and omissions insurance
carried by Spencer Press, Inc. (Spencer), did not cover as an
insured loss the cost to Spencer of defective mail order
catalogs returned, or not paid for, by Spencer's customer,
Deerskin Trading Post (Deerskin), or refunds that Spencer
had to pay to Deerskin. That conclusion accords with a judg-
ment for the insurer ordered by the judge of the Superior
Court who heard the case. As she put it: "The exclusion

---

[1]Graphic Arts Mutual Insurance Company and Utica National Insur-
ance Group.

clause prohibits both the named insured and customers of the named insured from making a claim for damage to work product."

From that general conclusion, we return to the genesis of the controversy. Spencer is a commercial printer. For the year running from January 14, 1980, to January 14, 1981, it bought a "Commerical Umbrella Liability" policy jointly underwritten by Utica Mutual Insurance Company and Graphic Arts Mutual Insurance Company, which we shall refer to collectively as "Utica."[2] The policy included errors and omissions coverage to a limit of $25,000,000. In September of 1980, during the policy period, Spencer printed a sales catalog for Deerskin, a mail order leather goods business, as it had regularly since the early 1970's. On a run of 4,000,000 fall sales catalogs for 1980, Spencer failed to trim spots of excess glue from order form inserts, causing pages of the catalog to stick together and, consequently to hide, not only some of the copy and art work but, in most of the catalogs, also the mail order forms. That mishap, over the course of the considerable litigation it spawned, became known as "the glue problem."

Deerskin claimed $891,612 in damages from Spencer, based on profits lost from customers who did not place orders because they could not find the order blanks, as well as other categories of consequential damages. That claim was not successful.[3] Deerskin did succeed, however, after jury trial, in recovering a refund of $175,000 it had paid to Spencer on account of the catalog. It is that amount for which Spencer seeks indemnity from Utica in the action we currently consider.

1. *Coverage.* The insurance policy Spencer had bought from Utica insured against liability "arising out of any negligent act, error, or omission . . . which happens in the course of providing printing services during the policy period." There was in the policy, however, the following exclusion:

"This policy does not apply:

[2]The complaint names Utica National Insurance Group as a defendant, although its name does not appear on the insurance policy.

[3]Spencer successfully invoked contractual language which disclaimed liability for consequential damages that might flow from errors or imperfections in the material it printed for Deerskin. See *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 121-124 (1986).

(h) with respect to work performed by or on behalf of the insured and with respect to damages or expenses claimed by the named insured (1) to any property damage to such work which arises out of any part or portion thereof or out of any materials, parts or equipment furnished in connection therewith . . ."

Spencer acknowledges that the exclusion denies it coverage of damage to its own work product such as might occur, for example, from the printing machinery chewing up a run of catalogs so that they were all tattered and could not be delivered to the customers. The case stands differently, Spencer argues, if, as here, the catalogs emerge from the printing run apparently in good condition but containing a flaw which causes the customer, when it discovers the flaw after delivery, to want — and be entitled to — its money back. After all, Spencer reasons, it must pay damages, i.e., a refund to its customer for the defective catalogs, an obligation that flows from an error, exactly what it bought insurance against.

Spencer is mistaken, as becomes apparent as soon as one pauses to reflect that had Spencer discovered the glue problem before the catalogs left its plant or warehouse, the loss is incontestibly not an insured loss. A difference in coverage does not occur because the customer was the first to discover the glue problem. The limitation of coverage worked by the exclusion does not make the insurance policy illusory. The purpose, among others, of the policy is to insure Spencer against claims arising consequentially out of a printing error. For example, had a printing error advertised gloves for sale at $5.00 per pair instead of an intended $50 per pair, and had Deerskin been obliged to deliver 10,000 pairs of gloves at the lower price, and had Spencer become liable[4] to Deerskin for its $450,000 loss, that liability would be covered by the Utica policy.

The distinction made by the illustrations was marked relatively recently in *Commerce Ins. Co.* v. *Betty Caplette Builders, Inc.*, 420 Mass. 87, 90-93 (1995), which considered the "product exclusion" in the context of a house built and sold by a real estate developer. A similar "product exclusion" in the developer's comprehensive general liability insurance

---

[4]The illustration assumes the absence of contractual language exculpating Spencer from liability for a customer's consequential damages.

policy did not cover the developer's obligation to make good four defective septic systems. It is worth repeating in this context an explanation by a text writer, set out in the *Betty Caplette Builders, Inc.* opinion at 91, about the scope of product liability coverage as commonly written:

> "The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb. L. Rev. 415, 441(1971).

The last sentence of the quoted portion from the Henderson article may not be applied literally to the coverage Spencer bought from Utica, because that policy contained "printer's catastrophe coverage" which insured Spencer for contractual liability derivative to the defective printed product, i.e., damages of the sort described in the erroneous glove price example. By reason of the exclusion — and the exclusion appears to be a garden variety one — repair or replacement of the defective product itself or having to give money back to a customer because the product was defective becomes an uninsured business risk. Discussion of uninsured business risks appears in *Sterilite Corp.* v. *Continental Cas. Co.*, 17 Mass. App. Ct. 316, 321-322 & n.13 (1983).

We have considered Spencer's arguments about: the insurance buyer's reasonable expectations (see *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 700 [1990]);

construing the policy strictly against the insurer (see *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 323-324 [1991]); and resolution of ambiguities against the insurer (*Ibid*). None alters the conclusion that a reasonably informed manufacturer would not expect or, from the language of the policy, conclude that the policy insured against repair, replacement or refund as to the product itself.

2. *Estoppel claim.* When Spencer informed Utica of Deerskin's claim, Utica agreed to defend with a reservation of rights that breach of contract might not be covered under the insurance. In a subsequent letter, dated April 28, 1982, defending the scope and accuracy of its investigation, Utica wrote that some of the language in Deerskin's complaint "is such that it may well be interpreted as to include a breach of implied warranty of workmanlike performance, which is covered." Spencer argues that the quoted language led it reasonably to believe that damage to its work product would be covered as a breach of warranty and that Utica is estopped from denying coverage. Cf. *Royal-Globe Ins. Co.* v. *Craven*, 411 Mass. 629, 634-635 (1992).

Such a belief would have been distinctly unreasonable as the same letter went on to disclaim specifically coverage for the product "itself" and to say that a judgment "pertaining to the cost of the catalogs would be your personal responsibility." Apart from the unreasonable character of its purported reliance, Spencer makes a still less plausible case for the proposition that, on the basis of its reliance, it changed its position. The notion that, but for its expectation that Utica would cover its loss, Spencer would have worked out its quarrel with Deerskin is discredited by the simultaneous engagement of Spencer in more intense litigation involving consequential damages and other unpaid printing costs owed by Deerskin. See *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118 (1986). The Superior Court judge correctly rejected the estoppel argument.

3. *Spencer's claims under G. L. c. 93A and c. 176D.* Spencer's claim that Utica dealt unfairly with it, in the sense violative of G. L. c. 93A, by refusing to indemnify it for the damages Spencer was ordered to pay Deerskin evaporates by reason of the conclusion that Utica was not required so to do under the insurance policy.

The alternative claim under c. 93A and c. 176D is based on

an asserted failure by Utica to investigate or manage adequately, or to settle in good faith, the Deerskin claim. In consequence, Spencer says, it lost a valued customer. Spencer's c. 93A claim is based on an allegation of "[f]ailing to effectuate prompt, fair and equitable settlements of claims" as required by G. L. c. 176D, § 3(9)(f), as appearing in St. 1972, § 543, § 1, and other violations of § 3(9). See *DiVenuti* v. *Reardon,* 37 Mass. App. Ct. 73, 79 (1994). A violation of G. L. c. 176D, § 3(9), however, does not support a § 11 action, i.e., business against business claim, under c. 93A. *Jet Line Servs., Inc.* v. *American Employers Ins. Co.,* 404 Mass. 706, 717 n.11 (1989). *Transamerica Ins. Group* v. *Turner Constr. Co.,* 33 Mass. App. Ct. 446, 452 (1992). *DiVenuti* v. *Reardon,* 37 Mass. App. Ct. at 79. Parenthetically, we concur with the findings of the trial judge that Utica's handling of the investigation and its communications with its insured, while not without flaw, were, on the whole conscientious and in good faith.

*Judgment affirmed.*