Doerfer, J.
INTRODUCTION
This is a class action filed by various chiropractors against the defendant health care coordinators, managed care discount brokers and automobile insurers for allegedly taking wrongful discounts on Personal Injury Protection medical expense claims. Phis matter is before the court on defendant MedView’s motion to dismiss Count I of the complaint pursuant to Mass.R.Civ.P. 12(b)(6). Defendant Concentra has filed a motion to dismiss III of the complaint pursuant to Mass.R.Civ.P. 12(b)(6). Defendant IntraCorp has filed a motion to dismiss Count IV of the complaint pursuant to Mass.R.Civ.P. 12(b)(6). Finally, defendants Arbella, Commerce, Holyoke Mutual, People, Premier and Trust have filed a motion to dismiss Counts II and V pursuant to Mass.R.Civ.P. 12(b)(6). For the reasons discussed below, MedView’s motion to dismiss is DENIED, Concentra and IntraCorp’s motion to dismiss is ALLOWED, and the automobile insurers’ motion to dismiss is DENIED.
BACKGROUND
The following facts are taken from the plaintiffs’ class action complaint. Joseph R. Mitzan d/b/a Mitzan Chiropractic Office (Mitzan) is a medical provider licensed in the Commonwealth of Massachusetts to provide chiropractic services. James M. Freitas d/b/a Freitas Chiropractic Office (Freitas) is also a medical provider licensed in the Commonwealth of Massachusetts to provide chiropractic services. Defendants Commerce Insurance Company (Commerce), Trust Insurance Company (Trust), Peoples Service Insurance Company (Peoples), Premier Insurance Company of Massachusetts, Inc. (Premier), Arbella Mutual Insurance Company (Arbella), Commercial Union Insurance Company (Commercial Union), Holyoke Mutual Insurance Company (Holyoke), and Plymouth Rock Assurance Corporation (Plymouth Rock) are all insurance companies duly established under the laws of the Commonwealth of Massachusetts.
Defendant MedView Services, Inc. (MedView) is a health care business that operates the MedView Preferred Provider Organization (MedView PPO).[4] MedView develops contractual arrangements with insurance companies, employers, third-party administrators and other business entities, known as “Payors,” for the purpose of coordinating and arranging for the delivery of health care services to subscribers by medical providers who belong to the MedView network of health care professionals.
On November 20, 1992, Freitas entered into a contract with MedView to be a participating health care preferred medical provider (Preferred Provider) in the MedView PPO network. Similarly, on December 28, 1993, Mitzan entered into a contract with MedView to be a Preferred Provider in the MedView PPO network. As Preferred Providers, Freitas and Mitzan agreed to provide health care services to MedView subscribers at a discounted rate of 20% less than the usual rate charged to patients for their services. In exchange for this volume discount, MedView agreed to market Freitas and Mitzan’s services to existing and potential Payors, including but not limited to, insurers, employers and union trust funds. Under the contract, Freitas and Mitzan authorized MedView to:
identify and publish (their) name, address and available services in MedView’s information materials for distribution to Subscribers and in market *244 ing materials for distribution to contractors and potential contractors.
However, MedView agreed that it would not disclose the compensation payable to Freitas and Mitzan under the terms of the contract except to the extent required by applicable law or necessary in order to carry out the terms of the agreement.
MedView contracted with the defendant Concentra Managed Care, Inc. (Concentra), to allow Concentra to access a database containing the identities of MedView’s Preferred Providers and the discounted fees that they were willing to accept for medical services under the MedView contract. Freitas and Mitzan’s discounted chiropractic rates were included in this database. Concentra established a Voluntary Network Access Program (VNA Program) whereby automobile insurers could access PPO discount information. Con-centra entered into cost containment contracts with various automobile insurers, including but not limited to Premier, Commerce and Trust, under which Con-centra agreed to process and review medical bills received by the insurers pursuant to Personal Injury Protection (PIP) claims authorized by G.L.c. 90, §§34A-M and Part 2 of the Standard Massachusetts Automobile Insurance Policy.
Concentra offered the insurers access to an automated cost containment system, including a Preferred Provider Organization Repricing System (PPO Repricing System), that reprices medical bills by applying Preferred Provider discounts to the bills. Concentra represented to the insurers that the medical providers in its database were obligated under separate contracts to provide negotiated discounts which could be applied retroactively through Concentra’s repricing system. Concentra receives up to one third of the discount as compensation for applying the discounts. Concentra thus agreed with the automobile insurers to allow them access to the MedView discounted PPO rates through its PPO Repricing System.
In addition, MedView contracted with the defendant IntraCorp to allow IntraCorp to access the MedView Preferred Provider network. IntraCorp utilized a provider fee management database known as AccuMed through which it provided its customers with automated review of medical charges and a recommended amount to be paid for such charges. The AccuMed database included information on providers such as Freitas and Mitzan who were enrolled in the MedView PPO.
IntraCorp entered into cost containment contracts with various automobile insurers, including but not limited to Commercial Union, Arbella, Premier, Hol-yoke Mutual and Peoples, under which IntraCorp agreed to process and review medical bills received by the insurers pursuant to PIP claims. IntraCorp thus agreed with the automobile insurers to allow them access to the MedView discounted PPO rates through its AccuMed System.
In the course of their medical practice, Freitas and Mitzan provided treatment to patients entitled to PIP benefits under G.L.c. 90, §§34A-M (PIP patients). Prior to their treatment by Freitas and Mitzan, these PIP patients did not receive any marketing materials from MedView, Columbia, Concentra, IntraCorp or the automobile insurers identifying the chiropractors’ names, addresses and available services. Further, at no time prior to treatment did these PIP patients present to Freitas or Mitzan subscriber cards identifying them as members of the MedView PPO or MedView subscribers entitled to benefits under the MedView contract with Mitzan. After treating the PIP patients, Freitas and Mitzan submitted bills for medical services to the automobile insurers for payment pursuant to G.L.c. 90, §§34A-M and Part 2 of the Standard Massachusetts Automobile Insurance Policy, expecting to be paid the full amount of the bills.
Using the VNA Program and AccuMed, Concentra and IntraCorp processed the PIP claims and advised the automobile insurers to pay the bills at the discounted MedView PPO rate. The defendants have discounted claims for PIP medical services submitted by Freitas in an amount totaling $4,500. The defendants have discounted claims for PIP medical services submitted by Mitzan in an amount totaling $8,464.03.
Accordingly, on July 1, 1998, Freitas and Mitzan (the chiropractors) filed the present suit on behalf of themselves and all similarly situated medical providers.[5] Count I of the Complaint for breach of contract alleges that MedView/Columbia breached its Preferred Provider Agreement by disclosing the plaintiffs’ confidential compensation and discount information to Concentra, IntraCorp and the automobile insurers, and allowing plaintiffs’ volume discounts to be applied to PIP claims without providing consideration or compensation. Count II alleges that the defendant insurers have violated G.L.c. 90, §34M by claiming PPO discounts on PIP medical bills and failing to pay the plaintiffs the full amount of the bills submitted. Count III alleges that Concentra has committed an unfair and deceptive practice under G.L. Chapter 93A by knowingly operating an illegal “silent” PPO through its VNA Program. Similarly, Count TV alleges that IntraCorp has committed an unfair and deceptive practice under G.L. Chapter 93A by knowingly operating an illegal “silent” PPO through its AccuMed System. Finally, Count V of the complaint alleges that the defendant automobile insurers have committed an unfair and deceptive practice under G.L. Chapter 93A by discounting the plaintiffs’ claims for the provision of PIP medical services, knowing that such discounts were illegal.
DISCUSSION
When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, the court must accept as true the well pleaded factual allega- *245 Hons of the complaint as well as any inference which can be drawn therefrom in the plaintiffs favor. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991). This Court grants the radical relief of dismissal only if the plaintiff can set forth no set of facts which would entitle him to relief. Coraccio v. Lowell Five Cents Savings Bank, 415 Mass. 145, 147 (1993). Further, a complaint should not be dismissed because it asserts a novel or extreme theory of liability or improbable facts. Municipal Light Co. v. Commonwealth of Massachusetts, 34 Mass.App.Ct. 162, 166, rev. den., 415 Mass. 1102 (1993).
I. MED VIEW’S MOTION TO DISMISS TO COUNT I
Count I of the complaint alleges that MedView breached the Preferred Provider Agreement by disclosing the chiropractors’ volume discounts to managed care discount brokers such as Concentra and IntraC-orp, and allowing the application of PPO discounts to PIP medical expense claims. MedView contends that Count I fails to state a claim upon which relief can be granted because as a matter of law, the Agreement cannot be construed to support the chiropractors’ allegations of breach.
In ruling on a 12(b)(6) motion for failure to state a claim, the court must examine only the facts set forth in the complaint and must exclude all materials outside the pleadings. General Motors Acceptance Corp. v. Abington Casualty Ins. Co., 413 Mass. 583, 584 (1992). Where both parties agree that there is no genuine issue of material fact as to the interpretation of the language of a contract, it is proper for the court to interpret the contract on a motion to dismiss for failure to state a claim. Gomes v. Metropolitan Property & Cas. Ins. Co., 45 Mass.App.Ct. 27, 31-32, rev. den., 428 Mass. 1102 (1998). See also Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 406-409 (1995) (concluding that a contract claim was properly dismissed pursuant to Rule 12(b)(6) where accepting plaintiffs allegations as true, the defendant acted within its contractual rights in terminating her).
In the present case, it should be noted that the chiropractors did not attach a copy of the PPO Agreement to their complaint. However, MedView has submitted a copy of the Agreement to this Court in connection with its Rule 12(b)(6) motion. The interpretation of an unambiguous written contract is a matter of law for the court. Hiller v. Submarine Signal Co., 325 Mass. 546, 549-550 (1950); Barranco v. Milford Housing Authority, 408 Mass. 502, 506 (1990). Whether or not an ambiguity exists is a matter of law for the court. Freelander v. G&K Realty Corp., 357 Mass. 512, 516 (1970); Fred S. James & Co. of New England, Inc. v. Hoffmann, 24 Mass.App.Ct. 160, 165, rev. den., 400 Mass. 1103 (1987). Contract language is considered ambiguous where the terms of the agreement are inconsistent on their face or where the phraseology of the agreement can support reasonable differences of opinion as to the meaning of the words employed and the obligations undertaken. Forte v. Caruso, 336 Mass. 476, 480 (1957); Merrimack Valley National Bank v. Baird, 372 Mass. 721, 724 (1977). However, an ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other. Lumbermens Mutual Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
Both the chiropractors and MedView address the proper interpretation of the Agreement in their briefs, and neither party argues that the document is ambiguous or that extrinsic evidence is necessary to resolve the breach of contract claim. This Court finds the Agreement to be unambiguous, such that its interpretation is a matter of law appropriately resolved by this Court. Accordingly, this Court will treat MedView’s motion to dismiss Count I as if the Agreement had been properly attached to and incorporated by reference in the complaint.
The chiropractors allege that MedView breached the PPO Agreement by disclosing and/or selling their discount information to Concentra and IntraCorp, who are not legitimate payors under the terms of the Agreement. MedView argues, however, that the Agreement does not exclude automobile insurers from the wide range of payors to whom MedView agreed to market the chiropractors’ services. The PPO Agreements at issue were entered into between MedView and the chiropractors, who are referred to therein as the “Health Care Professional” (“HCP”). Each Agreement contains a recital stating:
A. MedView develops contractual arrangements with Payors, which include employers, insurance carriers, third-party administrators and other similar entities for the purpose of coordinating and arranging for the delivery of Health Care Services to Subscribers. Certain of those arrangements relate solely to Workers’ Compensation Programs, while other arrangements relate generally to programs for the provision of Health Care Services.
B. HCP wishes to provide Health Care Services to Subscribers in accordance with the terms of this Agreement and MedView wishes HCP to provide those services to Subscribers.
Pursuant to Article III of the Agreement:
A. HCP shall render Health Care Services to Subscribers which HCP is qualified by law to provide, which are medically necessary and consistent with the standard of quality of care generally accepted in their respective medical communities.
Pursuant to Article I, paragraph G, “Subscriber” means “a person who is entitled to receive certain benefits with respect to Health Care Services.”
In exchange, pursuant to Article VII:
MedView agrees to make good faith efforts, within reasonable budgetary constraints, to market the *246 HCP’s services to existing and potential Payors, including but not limited to, business entities such as insurance companies, employers and union trust funds provided, however, MedView does not guarantee to the HCP any minimum number of MedView Subscriber patients.
However, pursuant to Article IX(C):
MedView and HCP agree that they will not disclose the compensation payable to HCP pursuant to the terms of this Agreement, except to the extent required by applicable laws or as may be required in order to carry out the terms of this Agreement.
Finally, pursuant to Article I, paragraph E of the Agreement, “Payor" means:
an insurance company, employer, third-party administrator, or other business entity which has contracted with MedView to pay for Health Care Services rendered by the HCP to MedView insured employees.
The chiropractors argue that the phrase “which has contracted with MedView to pay for Health Care Services rendered by the HCP to MedView insured employees” modifies not only the term “business entity” but also the terms “insurance company,” “employer” and “third-party administrator.” Under such an interpretation, payors are limited to those entities having relationships with employers and arranging for health care services for insured employees. Thus, because Concentra and IntraCorp are not third-party administrators which pay for claims of “insured employees,” and the automobile insurers are not insurance companies which pay for claims of “insured employees,” they were not proper Payors to whom MedView could disclose the chiropractors’ negotiated PPO discount rate, and MedView breached the Agreement by allowing these parties to retroactively apply the 20% discount to the PIP claims at issue.
MedView invokes the general rule of grammatical, statutory and contract construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation. Moulton v. Brookline Rent Control Board, 385 Mass. 228, 230-31 (1982); Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 123 (1986). MedView thus contends that the “insured employees" clause in the definition of “Payor” is limited to the term “other entities.” In the present case, however, an examination of the Agreement as a whole suggests that the dominant purpose of this PPO arrangement was to create increased patient volume by marketing the chiropractors’ services to subscribers, prior to the rendering of such services, in exchange for the negotiated 20% discount.
Article VII of the Agreement provides that:
MedView agrees to make good faith efforts, within reasonable budgetary constraints, to market the HCP’s services to existing and potential Payors, including but not limited to, business entities such as insurance companies, employers and union trust funds provided, however, MedView does not guarantee to the HCP any minimum number of MedView Subscriber patients.
MedView argues that it marketed the chiropractors’ services in accordance with this provision when it contracted with Concentra and IntraCorp to allow them to access its PPO discount information. Admittedly, Article VII does not explicitly impose an obligation on MedView to market the chiropractors’ services only to those Payors who will steer subscribers toward the chiropractors either through advertising and informational activities or financial incentives. Nonetheless, such a steerage requirement is necessarily implied in the Agreement if the chiropractors are to receive meaningful consideration in exchange for providing their services at a 20% discount.
The primary and inflexible rule is that contracts are to be construed so as to ascertain the true intention of the parties and to give effect to the purpose of the agreement. Kerrigan v. Boston, 361 Mass. 24, 33 (1972); Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981); Hubert v. Melrose-Wakefield Hospital Assoc., 40 Mass.App.Ct. 172, 177 (1996). A contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1995); Hastings Associates, Inc, v. Local 369 Building Fund, Inc., 42 Mass.App.Ct. 162, 170 (1997). MedView’s interpretation of the contract, under which its conduct in selling Concentra and IntraCorp the right to apply negotiated discounts retroactively would constitute the performance bargained for by the chiropractors, defies common sense because the chiropractors would obtain no advantage by such a system. Rather, the chiropractors would benefit only from advance marketing which increases the demand for their services and volume of patients, as when subscribers are steered toward preferred providers prior to receiving treatment. A contract should be interpreted so that the parties’ performance provides the necessary consideration for a valid agreement. While it is this Court’s task to interpret the particular contract entered into by the parties in the present case, it is not without force that as recognized by numerous cases from other jurisdictions, the steerage of patients to preferred providers is considered “the very heart of the PPO arrangement.”[6]
MedView’s actions in selling the chiropractors’ discount information to brokers such as Concentra and IntraCorp thus do not appear to fall within the marketing obligations contemplated by the Agreement. This is evident by the very nature of the PIP insurance scheme at issue. General Laws Chapter 90, §§34A and 34M require that every motor vehicle liability policy or bond issued in the commonwealth provide coverage *247 for all reasonable expenses incurred within two years of the date of a motor vehicle accident for necessary medical, surgical, x-ray and dental services, including prosthetic devices and reasonable ambulance, hospital, professional nursing and funeral services, due and payable as loss accrues, upon receipt of reasonable proof of the fact and amount of expenses and loss incurred. See G.L.c. 90, §§34A-M (1994). Under the Standard Automobile Insurance Policy, automobile insurers must pay the full amount of all reasonable medical bills for necessary services and have no control over an insured’s choice of physician and course of treatment. PIP coverage thus operates as an indemnity policy in the sense that automobile insurers do not manage care in advance but rather, receive and pay bills only after treatment has been rendered. Accordingly, under the statutory scheme, MedView is not legally authorized to create incentives for PIP insureds to choose the chiropractors’ services, and cannot provide consideration for the chiropractors’ discounted rate with respect to such individuals.
Nonetheless, MedView argues that steerage of insureds is not a requirement under the Agreement because it provides other services in consideration for the chiropractors’ negotiated discount. Article IV of the Agreement sets forth MedView’s additional duties, which include processing claims for health care services, performing utilization and quality assurance review of inpatient hospital and health care services, adjusting fees for health care services to the discounted rate, and maintaining adequate professional liability insurance. Even assuming that the performance by MedView of these non-marketing administrative tasks constitutes adequate consideration for the discount, it appears that with respect to the PIP insureds at issue here, MedView did not perform such duties.
For example, intermediaries Concentra and Intra-Corp, rather than MedView, processed the chiropractors’ bills for services provided to PIP insureds and adjusted the fees to the discounted rate which purportedly applied. Further, MedView did not perform utilization and quality control services with respect to the PIP claims. Although automobile insurers are entitled to review such claims to determine whether the treatment rendered was medically necessary and the expenses charged were reasonable, in the present case, the automobile insurers contracted with Concentra and IntraCorp, not MedView, to provide such a review. Thus, given that MedView did not provide any administrative services with respect to the PIP claims at issue, it provided no consideration for the chiropractors’ discounted rate.
Accordingly, this Court concludes that ’ne “insured employees” clause in the definition of “Payor” is not limited to the term “other entities,” but also applies to the terms “insurance company,” “employer” and “third-party administrator.” The subject matter of the Agreement and its apparent dominant purpose require this interpretation, notwithstanding the general rule of construction confining a modifying clause to the last antecedent. See Moulton v. Brookline Rent Control Board, supra at 230-31 (1982); Deerskin Trading Post, Inc. v. Spencer Press, Inc., supra at 123. The Agreement is a rational business instrument only if construed in such a way that subscribers are participants in a managed care system, i.e., “insured employees,” under which MedView markets the chiropractors’ services by steering said subscribers to the chiropractors in advance of treatment, resulting in a potentially increased volume of business. This Court declines MedView’s invitation to resolve the present contract case on a motion to dismiss by applying a rule of grammatical construction in a hypertechnical manner in absolute disregard of the business context of the Agreement and its common sense purpose, particularly given the novel issues raised by this case and the likelihood that such issues will recur.
Thus, under the terms of the Agreement, it appears that Concentra, IntraCorp and the automobile insurers were not proper Payors to whom MedView could disclose the chiropractors’ negotiated discount, since they did not contract with MedView to pay for health care services rendered by health care providers to MedView insured employees. Accepting the chiropractors’ allegations as true and drawing all reasonable inferences in their favor, the Preferred Provider Agreement can be construed to support their allegations of breach. Accordingly, Count I of the complaint states a claim upon which relief may be granted, and MedView is not entitled to dismissal under Mass.R.Civ.P. 12(b)(6).
II. CONCENTRA’S MOTION TO DISMISS COUNT III & INTRACORP’S MOTION TO DISMISS COUNT IV
Count III of the complaint alleges that Concentra has committed an unfair and deceptive practice under G.L. Chapter 93A by knowingly operating an illegal “silent” PPO through its VNA Program, while Count IV alleges that IntraCorp has committed an unfair and deceptive practice under G.L. Chapter 93A by knowingly operating an illegal “silent” PPO through its AccuMed System. Concentra and IntraCorp move to dismiss Count III and IV, respectively, pursuant to Mass.R.Civ.P. 12(b)(6) on the ground that they fail to state claims upon which relief can be granted.
General Laws Chapter 93A, section 2 provides in relevant part:
Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. G.L.c. 93A, §2 (1994).
Section 11 further provides in relevant part:
Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or *248 property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may bring an action in the superior court... G.L.c. 93A, §11 (1994).
In deciding unfairness under G.L.c. 93A, §11, the court must focus on the nature of the challenged conduct and the purpose and effect of that conduct. Massachusetts Employers Insurance Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995)..“To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the anti-heroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness." VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 620 (1994). Although whether conduct in its factual s etting is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a Chapter 93A violation is a question of law for the court. Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 414 (1991), modified 412 Mass. 703 (1992); Shepard’s Pharmacy v. Stop & Shop Cos., Inc., 37 Mass.App.Ct. 516, 520 (1994).
A. Absence of Commercial Transaction Between Parties
Concentra and IntraCorp first contend that Counts III and IV of the complaint fail to state a claim because Chapter 93A does not regulate conduct in the absence of a business relationship between the parties. The chiropractors do not allege any contractual or other transactional relationship between themselves and Concentra and IntraCorp. Rather, the chiropractors entered into the PPO Agreement with MedView and MedView entered into a separate broker agreement with Concentra and IntraCorp, who entered into separate cost containment agreements with the defendant automobile insurers. Concentra and IntraCorp then advised the automobile insurers to pay the chiropractors’ bills at the discounted rate.
It is well established that parties need not be in contractual privity in order for their actions to come within the regulatory ambit of Chapter 93A, so long as the parties are engaged in more than a minor or insignificant business relationship. Nei v. Boston Survey Consultants, Inc., 388 Mass. 320, 324 (1983); Maillet v. ATF-Davidson Co., 407 Mass. 185, 191 (1990); Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass.App.Ct. 545, 551 (1995); Chestnut Hill Development Corp. v. Otis Elevator Co., 653 F.Supp. 927, 933 (D.Mass. 1987). Nonetheless, the history and development of Chapter 93A suggest that it was enacted to protect consumers and business entities against unfair acts and practices in transactions between them. See Cash Energy, Inc. v. Weiner, 768 F.Supp. 892, 893 (D.Mass. 1991). Thus, numerous courts have held that there must be some transactional relationship between the parties in order to sustain a claim under Chapter 93A. See Arthur D. Little, Inc. v. East Cambridge Savings Bank, 35 Mass.App.Ct. 734, 743, rev. den., 417 Mass. 1103 (1994) (dismissing 93A claim where no commercial relationship ever existed between the plaintiff and a bank which was brought into suit under trustee process); John Boyd Co. v. Boston Gas Co., 775 F.Supp. 435, 436 (D.Mass. 1991) (dismissing 93A claim where owner of contaminated property never had any dealings with the original owner who caused the contamination); Camacho v. Basteri, Civil No. 952332, 4 Mass. L. Rptr. 490 (Middlesex Super. Ct. Dec. 28, 1995) (dismissing 93A claim where property owners who alleged damage from the operation of a dog kennel across the street failed to identify any transaction between themselves and the kennel operator); Lambert v. Fall River Five Cent Savings Bank, Civil No. 9401521, 3 Mass. L. Rptr. 633 (Bristol Super. Ct. May 1, 1995) (dismissing 93A claim by second mortgagee against appraisal company for failure to inspect the property where there was no relationship between the parties).
In the present case, the chiropractors do not allege any contractual or other transactional relationship between themselves and Concentra and IntraCorp. Compare Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc., 36 Mass.App.Ct. 411, 416, rev. den., 418 Mass. 1104 (1994) (concluding that for purposes of Chapter 93A, a sufficient commercial relationship existed between claimant and insurance claim facilitator where they were engaged in arms-length negotiations over the claimant’s malpractice demand). That there may be a causal connection between the discount brokers’ conduct and damage to the chiropractors is not itself sufficient to sustain a cause of action under Chapter 93A. Accordingly, Counts III and IV of the complaint fail to state a Chapter 93A claim against Concentra and IntraCorp.
B. Merits of Chapter 93A Claim
Concentra and IntraCorp further move to dismiss Counts III and IV on the ground that even if the requisite transactional relationship between the parties could be established, the Chapter 93A claims against them are premised on the violation of numerous statutes and regulations, none of which they can be found to have violated. The chiropractors allege that the VNA and AccuMed programs constituted a “silent PPO” which violates or frustrates numerous statutes and regulations governing the automobile insurance industry and preferred provider organizations.
1. No-Fault Insurance Scheme
The chiropractors first allege that the VNA and AccuMed programs violate or frustrate the purpose of G.L.c. 90, §§34A-M and Part 2 of the Standard Massachusetts Automobile Insurance Policy, Sixth Edition. Chapter 90, sections 34A and 34M set forth the *249 PIP benefits which automobile insurers must provide to all policyholders in Massachusetts. Chipman v. Massachusetts Bay Transp. Authority, 366 Mass. 253, 256 (1974); Dominguez v. Liberty Mutual Ins. Co., 424 Mass. 112, 115 (1999). PIP benefits were instituted as a form of no-fault auto insurance in order to reduce the number of small motor vehicle tort cases in the court system, to provide a prompt, inexpensive means of reimbursing claimants for out-of-pocket expenses, and to address the high cost of motor vehicle insurance in the commonwealth. Creswell v. Medical West Community Health Plan, Inc., 419 Mass. 327, 328 (1995). Accordingly, Part 2 of the Standard Automobile Insurance Policy provides that the insurer is required to pay all reasonable expenses incurred as a result of a motor vehicle accident for necessary medical, surgical, X-ray and dental services.
The chiropractors emphasize that the express language of §§34A and 34M does not authorize the reduction of PIP medical provider bills based on PPO discounts. However, the absence of express authorization in the statute for cost containment programs does not lead inevitably to the conclusion that the use of such programs violates the statute. The chiropractors contend that the defendants’ cost containment programs violate the requirement in G.L.c. 90, §34A that insurers pay all reasonable expenses and the mandate that “nothing in this subsection shall be construed ... to interfere in any way with the claimant’s choice of physician or course of medical treatment.” G.L.c. 90, §34A (1994). But, as emphasized by the chiropractors themselves in connection with their breach of contract claim, neither MedView, Concentra and IntraCorp nor the automobile insurers in any way restricted PIP insureds’ choice of provider or course of medical treatment or even attempted to influence it through steerage to certain providers; rather, they applied discounts retroactively in cases where PIP insureds fortuitously chose to seek treatment from the chiropractors.
Further, this Court notes that the Division of Insurance has opined that an optional insurance endorsement offering a policyholder a reduced premium for PIP coverage in exchange for an agreement to use a restricted network of providers in case of medical treatment sought in connection with a PIP claim is not prohibited by the statutory scheme set forth at c. 90, §§34A-M. See Decision on Commissioner’s Authority to Approve an Optional Endorsement, Docket No. R96-39 (January 2, 1998). In so concluding, the Division of Insurance noted that G.L.c. 90, §§34A-M “neither endorses nor prohibits the use of managed care, or any other system, as a benchmark for determining what medical expenses are reasonable aid necessary.” Id. In addition, the Division of Insurance opined that an optional endorsement offering a PPO for PIP claims would not interfere with a policyholder’s choice of physician simply because the policyholder could choose at the outset whether or not to participate in the PPO and thus, restrict his or her care. Decision on Commissioner’s Authority to Approve an Optional Endorsement (January 2, 1998).
Finally, the application of cost containment programs to PIP claims is consistent with the purpose of the no-fault law to address the high cost of motor vehicle insurance in the commonwealth. See Flanagan v. Liberty Mutual Ins. Co., 383 Mass. 195, 198 (1981). Compare Nhem v. Metropolitan Property & Casualty Ins. Co., 1997 Mass. App. Div. 84, aff’d, 45 Mass.App.Ct. 1102 (1998) (approving auto insurer’s use of Provider Bill Audit System to ensure reasonableness of fees charged). Thus, the chiropractors fail to state a Chapter 93A claim based on an alleged violation of G.L.c. 90, §§34-34M or the Standard Automobile Insurance Policy.
2. Preferred Provider Regulations
The chiropractors next allege that Concentra and IntraCorp’s operations of the VNA and AccuMed programs violate Chapter 93A because they fail to comply with 211 Code Mass. Regs. §51.01 et seq. Section 51.02 provides in relevant part:
No organization may offer a preferred provider plan until it is approved by the Commissioner in accordance with the provisions of M.G.L.c. 1761 and 211 CMR 51.00.
A “preferred provider plan” is defined as “an insured health benefit plan offered by an organization that provides incentives for covered persons to receive health care services from preferred providers in the context of a preferred provider arrangement.” 211 Code Mass. Regs. §51.03. “Insured health benefit plan” is defined as “a health benefit plan in which the organization assumes financial risk arising out of the contractual liability to pay for or reimburse covered persons for covered services. The term does not include a health care in which an organization functions solely as a third-party administrator.” 211 Code Mass. Regs. §51.03. Finally, “Organization" is defined as:
an entity authorized by the Commissioner to bear risk, including, but not limited to companies licensed or otherwise authorized to write accident and health insurance pursuant to M.G.L. 176, non-profit hospital service corporations organized under M.G.L.c. 176A, medical service corporations organized under M.G.L.c. 176B, dental service corporations organized under M.G.L.c. 176E, optomet-ric service corporations organized under M.G.L.c. 176F, or health maintenance organizations licensed pursuant to M.G.L.c. 176G.
211 Code Mass. Regs. §51.03. The chiropractors do not allege that Concentra and IntraCorp bore any contractual liability or financial risk for health care claims under the VNA and AccuMed programs at issue; rather, they provided cost containment and billing review services to the automobile insurers. *250 Thus, the regulations at 211 Code Mass. Regs. §51.01 et seq. do not apply to Concentra and IntraCorp, and the chiropractors cannot establish a Chapter 93A violation on that basis.
3. Regulation of Insurers
Finally, the chiropractors allege that Concentra and IntraCorp’s operations of the VNA and AccuMed programs violate Chapter 93A because they violate several sections of G.L.c. 176D, §3A(iii), §3(2) and §3(8). A violation of Chapter 176D does not automatically constitute a violation of Chapter 93A, section 11.[7] Polaroid Corp. v. Travelers Indemnity Co., 414 Mass. 747, 754 (1993); Spencer Press, Inc. v. Utica Mutual Ins. Co., 42 Mass.App.Ct. 631, 636 (1997). Rather, a claim that Chapter 93A, section 11 was violated by a violation of G.L.c. 176D, §3 is of significance only to the extent that the plaintiff demonstrates that the alleged wrongful conduct is unfair or deceptive within the meaning of Chapter 93A, §2. Polaroid Corp. v. Travelers Indemnity Co., supra at 754.
The chiropractors allege that Concentra and Intra-Corp violated §3(2), §3(8) and §3A(iii) of Chapter 176D. However, the brokers contend that they are not subject to the provisions of Chapter 176D. Chapter 176D, section 2 states:
No person shall engage in this commonwealth in any trade practice which is defined in this chapter as, or determined pursuant to section six of this chapter to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance. G.L.c. 176D, §2 (1992).
A “person” under Chapter 176D is defined as:
any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit socieiy, operators of any medical service plan and hospital service plan as defined in chapters one hundred and seventy-six B, one hundred and seventy-six C, one hundred and seventy-six E, and one hundred and seventy-six F, insurers and sponsors of a legal services plan as defined in chapter one hundred and seventy-six H, any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters, the Massachusetts Insurers Insolvency Fund and any joint underwriting association established pursuant to law. G.L.c. 176D, §1 (1996).
Concentra and IntraCorp argue that they are not engaged in the business of insurance within the meaning of this section and are thus not subject to the prohibitions of section 3 of Chapter 176D.
The business of insurance involves profit driven business decisions about premiums, commissions, marketing, reserves and settlement policies and practices by entities who assume a risk of loss. Poznik v. Massachusetts Medical Professional Ins. Assoc., 417 Mass. 48, 51 (1994). Thus, an insurance claims administrator whose function was to minimize the ultimate exposure of an insurer was not engaged in the business of insurance within the meaning of Chapter 176D. Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc., supra at 415. Compare Zoppo v. John Hancock Ins. Co., 6 Mass. L. Rptr. 137, 1996 WL 655742 (Super. Ct. 1996) (concluding that the Group Insurance Commission was engaged in the business of insurance because it had ultimate control over determinations of eligibility and claim coverage, had unfettered discretion concerning the use of refunds from insurance companies, and as a self-insurer, it assumed the risk of loss). Based on the facts alleged in the chiropractors’ complaint, it does not appear that Concentra and IntraCorp are engaged in the business of insurance within the meaning of Chapter 176D, section 1 so as to render them subject to the prohibitions of Chapter 176D, section 3.
Nonetheless, in the context of a Chapter 93A claim, it may be appropriate to apply the standards of fairness set forth in G.L.c. 176D, §3 by analogy to non-insurers such as claims facilitators. Miller v. Risk Management Foundation, supraat 418. The chiropractors invoke §3(2), §3(8) and §3A(iii) of Chapter 176D. Chapter 176D, section 3(2) prohibits as an unfair or deceptive business practice:
False information and advertising generally: making, publishing, disseminating, circulating, or placing before the public or causing, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster or over any radio or television statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading. G.L.c. 176D, §3(2) (1996).
The chiropractors allege that Concentra and IntraCorp violated this provision by misrepresenting to the automobile insurers that they were entitled to apply the chiropractors’ 20% negotiated discount to PIP claims. However, G.L.c. 176D, §3(2) prohibits false advertising of insurance matters to the public, and is clearly aimed at protecting the public, not insurance companies. Thus, on the facts alleged in the complaint, Concentra and IntraCorp did not violate this statute.
Further, Chapter 176D, section 3(8) prohibits:
except as expressly provided by law, knowingly permitting or offering to make or making any insurance contract... or agreement as to such contract other than as plainly expressed in the insurance contract issued thereon, or paying or allowing, or giving or offering to pay, allow or give, directly or indirectly, as inducement to such insurance or annuity any rebate of premiums payable on the contract, or any special favor or advantage in the *251 dividends or other benefits thereon, or any valuable consideration or inducement whatever not specified in the contract. . . G.L.c. 176D, §3(8) (1996).
The chiropractors allege that Concentra and IntraCorp violated this provision by offering the chiropractors’ PPO discount to PIP insureds when such a benefit was not included in their automobile insurance policies. However, §3(8) prohibits the issuance of rebates or “kickbacks” to induce parties to buy insurance, and the chiropractors do not allege that the PIP insureds were induced to procure automobile policies by a promise of a 20% PPO discount on medical services.
Finally, pursuant to section 3A(iii), it is an unfair or deceptive act for an entity to seek to:
set the price to be paid to any health care facility by reference to the lowest price paid that provider under contract with any other nonprofit hospital service corporation, medical service corporation, insurance company, health maintenance organization, or preferred provider arrangement. G.L.c. 176D, §3A(iii) (1996).
Of all the statutes cited by the chiropractors, this provision has the most relevance to the facts alleged in the complaint. Arguably, Concentra and IntraCorp’s application of the chiropractors’ 20% MedView PPO discount to the PIP claims at issue violated this provision. Nonetheless, given the absence of a transactional relationship between the parties, the chiropractors cannot sustain a Chapter 93A claim on this basis. Accordingly, Counts III and IV of the complaint are properly dismissed under Rule 12(b)(6).
III. ARBELLA, COMMERCE, HOLYOKE MUTUAL, PEOPLES, PREMIER AND TRUST’S MOTION TO DISMISS
Finally, the defendant automobile insurers, with the exception of Plymouth Rock and Commercial Union, move to dismiss Counts II and V of the complaint pursuant to Rule 12(b)(6).
A. Statutory Breach of Contract
Count II of the complaint alleges that the automobile insurers improperly discounted by 20% the chiropractors’ bills for reasonable and medically necessary services rendered to PIP insureds, such that a balance remains outstanding on such claims pursuant to G.L.c. 90, §34M. Chapter 90, section 34M provides in relevant part:
In any case where benefits due and payable remain unpaid for more than thirty days, any unpaid party shall be deemed a party to a contract with the insurer responsible for payment of amounts therein determined to be due in accordance with the provisions of this chapter. G.L.c. 90, §34M (1996).
A health care provider who has not received full payment of his bill is included within the statutory definition of an “unpaid party” entitled to bring suit directly against the insurer. Ny v. Metropolitan Property & Casualty Ins. Co., 1998 Mass.App.Div. 181. The automobile insurers contend that the chiropractors are not “unpaid parties” because MedView, Concentra and IntraCorp properly extended the 20% PPO discount to PIP insureds and the chiropractors thus had no expectation that they would receive payment for the full amount of their bills. Although, as discussed above, the participation of PIP insureds in a PPO arrangement does not appear to violate the statutory scheme set forth at G.L.c. 90, §§34A-M, the plaintiffs have stated a valid claim that MedView, through Con-centra and IntraCorp, could not properly extend the chiropractors 20% discount to PIP insureds under the PPO Agreement at issue. If the automobile insurers paid only 80% of the bills submitted by the chiropractors, they may still owe the 20% balance, if the charges are otherwise valid. Accordingly, the chiropractors state a claim upon which relief under G.L.c. 90, §34M and Count II cannot be dismissed under Rule 12(b)(6).
B. Chapter 93A Claim
Finally, the automobile insurers move to dismiss Count V of the complaint, which alleges that they committed an unfair and deceptive practice under G.L. Chapter 93A by knowingly participating in an illegal “silent” PPO in violation of G.L.c. 90, §§34A-34M and the Standard Massachusetts Automobile Insurance Policy, 211 Code Mass. Regs. §51.01 et seq., and various provisions of G.L.c. 176D, §3. As a threshold matter, this Court notes that unlike the claims against Concentra and IntraCorp, the chiropractors had a sufficient transactional relationship with the automobile insurers, to whom they submitted bills for services rendered to PIP insureds for payment, to bring them within the purview of Chapter 93A.
With respect to the substance of the chiropractors’ Chapter 93A claims, as discussed supra, the chiropractors fail to state a claim based on violations of G.L.c. 90, §§34-34M and the Standard Automobile Insurance Policy or Chapter 176D, §3(2) and §3(8). Nonetheless, pursuant to Chapter 176D, section 3A(iii), it is an unfair or deceptive act for an insurer to seek to:
set the price to be paid to any health care facility by reference to the lowest price paid that provider under contract with any other nonprofit hospital service corporation, medical service corporation, insurance company, health maintenance organization, or preferred provider arrangement. G.L.c. 176D, §3A(iii) (1996).
The chiropractors may succeed under Chapter 93A if they demonstrate that the automobile insurers’ violation of this provision was unfair or deceptive within the meaning of c. 93A, §2. See Polaroid Corp. v. Travelers Indemnity Co., supra at 754. Accordingly, Count V of the complaint states a sufficient Chapter 93A claim against the automobile insurers to survive a motion to dismiss under Rule 12(b)(6).
*252 ORDER
For the foregoing reasons, it is hereby ORDERED that defendants MedView Services and Columbia HCA Healthcare Corporation’s motion to dismiss Count I of the complaint be DENIED. It is further ORDERED that defendant Concentra Managed Care, Inc.’s motion to dismiss Count III of the complaint and defendant IntraCorp’s motion to dismiss Count IV of the complaint be ALLOWED.
Finally, it is hereby ORDERED that the motion of defendants Commerce Insurance Co., Trust Insurance Co., Premier Insurance Co., Peoples Insurance Co., Arbella Mutual Insurance Co. and Holyoke Insurance Co. to dismiss Counts II and V of the complaint be DENIED.

 MedView has been acquired by defendant Columbia HCA Healthcare Corp.

 It does not appear that a class has been certified pursuant to Mass.R.Civ.P. 23.

 See HCA Health Services of Virginia v. Metropolitan Life Insurance, 957 F.2d 120, 121 (4th Cir. 1991) (“A PPO is a group of selected health care providers that agrees to charge lower rates on services in exchange for attracting a greater number of patients”); Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1546 (11th Cir.), cert. den., 519 U.S. 820 (1996) (noting that medical providers in a PPO agree to accept maximum fees and utilization review and quality control oversight because membership may increase their number of patients); Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc., 603 F. Supp. 1077, 1078 (S.D. Ind. 1985), aff'd, 784 F.2d 1325 (7th Cir. 1986) (’The concept of PPO is to provide subscribers with incentives to use those providers of health care services who hold potential for reducing the rate of increase in health care benefit costs”); Gavin North Sherwood Chiropractic Clinic v. Brower, 838 F.Supp. 274, 275 (M.D.La. 1993) (“A PPO is a contractual agreement between a health care provider and an employer [where] the health care provider offers services to the employer’s employees at reduced rates. In turn, the employer encourages its employees, as participants of the plan, to use the preferred providers designated by the PPO”); Federal Trade Commission v. Tenet Healthcare Corp., 1998 WL 433855, *2 (E.D.Mo.) (“PPOs provide their participants with incentives to use in-network health care providers by reimbursing a lower percentage of the fees ... if the individual chooses to use an out-of-network provider”).

 In contrast, section 9 of Chapter 93A explicitly creates an independent cause of action for the unfair claims settlement practices set forth at Chapter 176D, section 3(9).